## CIRCUIT COURT OF THE CITY OF RICHMOND

Convalescent Care, Inc.

v.

Commonwealth of Virginia

BY JUDGE RANDALL G. JOHNSON

January 30, 1996

Case No. HG-1048

I have now read plaintiff's supplemental memorandum in support of its motion for summary judgment, as well as the other submissions of both parties. As I suggested during my colloquy with you at the hearing, I am firmly convinced that a conflict exists between DMAS Regulation 3:3(E) and Va. Code § 9-6.14:12(H). I am also convinced that there is nothing in Title 32.1 of the Code, or elsewhere, which takes this case out of the general proposition that where a conflict between a statute and a regulation exists, the statute controls, and I reject plaintiff's arguments to the contrary. Accordingly, I hold that the Director's decision of September 19, 1995, was timely, and the motion for declaratory judgment will be dismissed.

September 17, 1996

Case No. HG-1283-4

This is an appeal under the Administrative Process Act, Va. Code § 9-6.14:1 et seq., from a decision of the Department of Medical Assistance Services (DMAS). The appeal involves an audit conducted by DMAS of the appellant, Convalescent Care, Inc. (CCI), for fiscal years 1986 through 1989. At issue are certain adjustments made to CCI's cost reports, the effect of which was to lessen the reimbursement paid to CCI under the Commonwealth's Medicaid program.

## Procedural Background .

CCI is a Virginia corporation which has an ownership interest in, and administers, five nursing home facilities in the state. DMAS is the state agency responsible for administering the state medical assistance program which is Medicaid. Medicaid is a statutory scheme designed to reimburse reasonable and necessary costs incurred by qualified providers of health services to the eligible needy. Through its Division of Cost Settlement and Audit, DMAS operates an auditing system to determine the propriety, necessity, and reasonableness of reimbursable costs for participating providers.

Between April 15 and. May 21, 1991, an on-site audit of CCI was conducted by DMAS for the years in question. Several items claimed by CCI for reimbursement were disallowed or reduced, and CCI filed an administrative appeal concerning ten such items. After more than three years of negotiations and submission of additional materials by CCI, all but four of the contested items were resolved. In December, 1994, a two-day hearing on the four remaining issues was held before a hearing officer. In June, 1995, the hearing officer rendered his decision, which was generally favorable to CCI on each such issue. Pursuant to Va. Code § 9.4.14:12(C), however, which makes it clear that a hearing officer's findings are not binding on an agency, DMAS' director rejected nearly all of the hearing officer's findings, and on September 19, 1995, issued on behalf of DMAS the agency's final decision. That decision was adverse to CCI on each of the four issues not previously resolved. CCI and DMAS have subsequently resolved one of those issues. The three issues remaining in CCI's appeal to this court are: (1) whether DMAS used a proper method for determining the allowable salaries of CCI's home office executives, (2) whether DMAS properly disallowed interest costs on certain loans incurred by CCI, and (3) whether DMAS properly limited the allowable compensation of CCI's medical director.

## Standard of Review

On an appeal of a final agency decision to this court, the burden is on the complaining party to "designate and demonstrate an error of law subject to review by the court." Va. Code § 9-6.14:17. The court must give deference to an agency decision based on the proper application of its expert discretion. *Fralin v. Kozlowski*, 18 Va. App. 697, 701, 447 S.E.2d 238 (1994). There are three categories of error that may be addressed to the court, and each has its own standard of review. The first category is

whether the agency acted in accordance with the law. *Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 242, 369 S.E.2d 221 (1988). For alleged errors in this category, the court may reverse the agency's decision only if the agency's construction of its regulations is arbitrary and capricious or fails to fulfill the agency's purpose as defined by its basic law. *Virginia Real Estate Bd. v. Clay*, 9 Va. App. 152, 161, 384 S.E.2d 622 (1989).

The second category of error which may be addressed on appeal is whether the agency had sufficient evidential support for its findings of fact. *Johnston-Willis, supra*, 6 Va. App. at 242. Where there has been a formal agency hearing, as here, the determination of factual issues is to be made upon the whole evidential record provided by the agency. *Virginia Real Estate Comm. v. Bias*, 226 Va. 264, 269, 308 S.E.2d 123 (1983). The findings must be supported by substantial evidence in the record. The phrase "substantial evidence" refers to " 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion'." *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) (emphasis in *Bias*)). Agency findings of fact may be rejected only if, after considering the record as a whole, the reviewing court determines that a reasonable mind would necessarily come to a different conclusion. *Id.*

The third category of error which may be the subject of an appeal is one of procedure. In fact, in a separate action in this court, CCI argued that the director's decision was not timely and, thus, that the decision of the hearing officer was final. The court, however, disagreed. *See* Case No. HG-1048-4, letter and order dated January 30, 1996. Since that issue was the subject of a separate action, it will not be commented on further in this appeal. Accordingly, only the first two categories of error are at issue here, and they present high standards in favor of the agency. Those standards, when combined with the deference which must be accorded agency action and the presumption of official regularity that attaches to agency actions, Va. Code § 9-6.14:17, amount to a preference in the law for leaving the actions of agencies undisturbed and are designed to provide stability and finality to the actions taken by administrative agencies. *See, e.g., Bias*, 226 Va. at 269. With these factors in mind, the issues will now be considered.

## 1. *Executive Compensation*

### A. *Mr. Seal's Salary*

Herbert L. Seal is the chairman and majority shareholder of CCI. He is also the director of CCI's nursing home facilities. For four of those facilities, Seal is paid directly by CCI. For the fifth facility, as well as for

another nursing home not owned or managed by CCI, he is paid by Sealcare, Inc., a separate corporation owned by him. One of the items claimed by CCI as reimbursable by Medicaid is the salary it paid to Seal as director of its nursing homes. DMAS limited the amount of such reimbursement. In doing so, DMAS used, as it does in all such cases, a national survey of salaries of executives in positions similar to Seal's. This is the Executive Compensation Service, or ECS, survey. In considering the appropriate amount of reimbursement to pay to a service provider for executive salaries, DMAS uses a point system to rate the executive in question in a particular case to determine what level of compensation is reasonable. Once an executive is rated, he or she is then placed, based on the rating, on a scale within the ECS survey. For reimbursement purposes, DMAS uses the range of salaries in the survey between the 75th percentile and the 25th percentile. In other words, if an executive rates 100 percent on the point scale, his or her company could only be reimbursed for that salary which does not exceed the figure which the ECS survey reports was earned by those executives in the 75th percentile, even though the executive's actual salary, as was the case with Seal's, exceeds the salary reflected by the 75th percentile. Likewise, if an executive rates at 0 percent on the point scale, he or she would still be reimbursed at the rate of the 25th percentile. DMAS then limits the reimbursement further by taking into account inflation in analyzing previous years and by making adjustments to reflect the geographic area in which the executive is employed. Finally, in this case, since Seal's compensation only relates to work for each of four of the five facilities that are a part of CCI and there is a sixth facility under Seal's management, DMAS allocated one sixth of his salary to each of the facilities. As a result, CCI could only be reimbursed 4/6 (or 2/3) of his salary after adjusted, as above. Seal rated 100 percent on the point system designed and used by DMAS. According to DMAS' formula, then, he was to be reimbursed at a rate equal to the 75th percentile in the ECS survey, reduced by the regional factor and the inflation/deflation applicable to each year analyzed and multiplied by 2/3. CCI challenges this decision for several reasons, each of which will be considered separately.[1]

---

[1] One basis for CCI's challenge, its argument that the use of the ECS survey is an impermissible *ex post facto* law, will not be considered since the court's analysis of the other arguments makes that one moot.

(1) *The ECS Survey*

CCI first argues that by limiting reimbursement for executive salaries to the 75th percentile of the ECS survey, DMAS has engaged in an arbitrary and capricious application of the Provider Reimbursement Manual (PRM) which applies to reimbursements under Medicaid. The hearing officer agreed with CCI's argument. So does the court.

Section 902.3 of the PRM allows for the reimbursement of "reasonable compensation." Reasonable compensation is defined as that amount which "would ordinarily be paid for comparable services by comparable institutions depending on the facts and circumstances of each case." That section goes on to say that reasonable compensation "is limited to the fair market value of services rendered by the owner in connection with patient care," and that fair market value is "the value determined by the supply and demand factors *of the open market.*" Emphasis added. DMAS' limitation described above is inconsistent with the PRM.

To justify its practice of limiting executive compensation as just described, DMAS offers an interesting argument. Specifically, DMAS argues that Virginia's taxpayers should not be expected to pay "top dollar" for Medicaid-related services. The ECS survey, says DMAS, includes the salaries of *all* of the top executives in the service industries in the nation, some of whom make "tremendous" amounts of money. The taxpayers, says DMAS, cannot be expected to pay such "outrageous" sums. Furthermore, DMAS points out, being compensated at a rate higher than 75% of all service industry executives is not a bad salary. DMAS' argument misses the point.

The relevant question on this issue is not what the taxpayers of Virginia should be expected to pay. Indeed, even if the court assumes that the relevant federal laws allow the General Assembly to enact statutes, or DMAS to adopt regulations, which limit a provider's reimbursable executive compensation as DMAS attempts to do here, there is presently no such limiting statute or regulation in Virginia. Instead, the PRM refers to *reasonable* compensation. The evidence before the hearing officer was uncontradicted that Seal's duties, responsibilities, and performance, when compared to the duties, responsibilities, and performance of similarly-situated executives throughout the country, earn him a spot at the top of the compensation ladder. In other words, Seal's salary, *in the open market*, is appropriate and reasonable. Since the PRM provides that reasonableness of compensation is to be determined by what happens in the open market, and since DMAS' limitation of that amount is directly at odds with such

open market determination, it is arbitrary and capricious, and will be reversed.

## (2) *Inflation/Deflation*

DMAS further reduced Seal's salary for inflation/deflation. Specifically, DMAS took the data available in 1989 and deflated it for the three previous years based on a "trend" table. CCI contends that this action should be reversed because of the lack of evidence of the accuracy of the resulting figures. In fact, DMAS did not initially produce the trend tables or the previous years' ECS surveys for the hearing officer. Upon request at the hearing, however, DMAS did produce the data for 1988. It has never produced the data for the previous years. The hearing officer ruled that absent an explanation for how the figures were deflated for the years prior to 1988, the figures applicable to that year should be used for the prior years as well. DMAS argues that this would be a waste of taxpayer money, since it is clear that the economy was different in 1986 than it was in 1988. As such, argues DMAS, to use the 1988 figures for 1986 and 1987 would not be proper.

As noted earlier in this opinion, there is a presumption of regularity in actions taken by a state agency. This does not mean, however, that DMAS may arbitrarily create ranges of data without empirical support, and the agency has failed to produce any support for the figures which it used in this case. While the burden of showing irregularity is on CCI, CCI does not need to show that the figures were incorrect. Rather, CCI must show that there is no substantial evidence in the record to support the agency's action. Here, there is no substantial evidence in the record to support the adoption of the figures as deflated by DMAS, and the decision of the director on that issue will be reversed.

## (3) *Regional/Geographic Adjustment*

The PRM provides that the reasonableness of executive compensation should be determined with reference to "comparable institutions in the same geographic area." Based on that provision, DMAS adjusted downward the reimbursable compensation for Seal. As CCI and the hearing officer point out, however, there is nothing in the record to demonstrate the basis for the amount of DMAS' adjustment. Absent such evidence, this adjustment also cannot stand.

It may be true, as DMAS argues, that all of CCI's facilities are located in Virginia, that Virginia is in the southeastern United States, and that the

southeastern United States has a lower average executive salary than does the nation as a whole. What DMAS has not shown, though, is how the actual adjustment made by it was calculated; that is, how the amount of the adjustment was determined. Further, DMAS did not show on the record why the southeastern United States was chosen as the relevant geographic area. While Virginia is located in the Southeast, it is also located on the "Eastern Seaboard," and is a "Mid-Atlantic state." DMAS cannot rely on generalities and suppositions to make the types of adjustments which it made here. Record evidence must exist. Because it does not exist with regard to this issue, the adjustment will be disallowed.

(4) *Allocation of Salary to Facilities*

The final matter of dispute concerning the compensation paid to Mr. Seal concerns the allocation of his salary to the six facilities with which he was involved. DMAS reasoned that he was paid a certain amount of money per year for his services and that since those services were spread over six facilities, his total compensation should be divided by six and then multiplied by four, the number of CCI facilities for which reimbursement is sought. CCI, on the other hand, argues that Seal's CCI salary should be considered separate from his other compensation since he devoted as much time to CCI as he would have even if he had no responsibilities outside of CCI. The court finds that this is a factual issue concerning the work done at each facility by Mr. Seal and that there is sufficient evidence in the record to support DMAS' adjustment of reimbursement for this factor. Accordingly, this particular adjustment will stand.

B. *Mr. Willis' and Mr. Jackson's Salaries*

Robert Jackson is CCI's chief financial officer and William Willis is CCI's chief operating officer. For the years in question, they were both located at CCI's home office but were paid salaries by each of CCI's facilities; that is, instead of receiving one salary check from CCI each pay period, they received separate salary checks from each CCI facility. As a result, the amount of salary paid by each individual facility never reached the upper limit for Federal Insurance Contribution Act (FICA) taxes, resulting in CCI's paying almost $14,000 more in FICA tax than federal law required. DMAS disallowed reimbursement for that amount. DMAS' action was appropriate.

It is CCI's argument that the structure of its organization is an internal matter which is not subject to review by DMAS. CCI is wrong. By requesting reimbursement from Medicaid, CCI necessarily opens the door to its organizational structure at least enough for DMAS to determine if CCI's costs are reasonable. The PRM previously referred to contains a "prudent buyer" concept (*see* PRM § 2103), which requires providers to act reasonably in incurring the costs for which they seek reimbursement. DMAS' determination that CCI did not act reasonably in incurring unnecessary FICA tax expense is not arbitrary or capricious, and it will be affirmed.

## 2. Interest Payments

In 1988, CCI constructed additions to its Colonial Heights and Valley facilities. Certificates of Public Need (COPN) were issued, announcing the facilities' intent to borrow money to fund the construction. The Colonial Heights COPN was issued on September 1, 1987, and the Valley COPN was issued on March 25, 1987. The loans were initiated on June 22, 1988, and June 6, 1988, respectively. It is DMAS' contention that certain monetary distributions were made by those facilities after the dates of their COPNs and that, had those distributions not been made, less money would have been needed to fund the construction. Consequently, the interest payments on the loans would have been lower. Accordingly, DMAS lowered its reimbursement of CCI's interest expense. CCI challenges DMAS' action on two grounds. First, CCI contends that the need for the loans should be determined as of the dates the loans were made, not the date of the COPNs. Second, CCI contends that all of the questioned distributions were either necessary or were not distributions at all. In either event, argues CCI, the full interest payments should be reimbursed.

With regard to the date on which need should be determined, that is, the date of the COPNs or the dates of the loans, the court finds that question to be irrelevant. What really matters in this case is whether the distributions made by CCI's facilities, whenever made, unnecessarily or improperly increased the amount of money which CCI borrowed. In other words, should CCI have used the questioned distributions to help pay for the construction for which the loans were made? The answer is different for different distributions.

## A. *Payments from Facilities to CCI*

Each of CCI's facilities is a limited partnership in which CCI is a general partner. CCI holds substantially all of the equity interest, 95% to 99% during the period in question, of each facility. Throughout the period before and after the Colonial Heights and Valley COPNs were issued and the loans were received, monthly payments were made by each of CCI's facilities to CCI for CCI's management services and to pay underlying debt. It is DMAS' contention that during the period of construction and construction loan repayment at the Colonial Heights and Valley facilities, those two facilities should not have made such payments to CCI. Instead, argues DMAS, the money should have been used to pay for, or help pay for, the construction. According to DMAS, CCI received enough money from the other facilities to pay its expenses and service its non-construction debt and, therefore, payments from the two facilities in question were not necessary for operations. The court agrees.

The evidence shows that CCI had sufficient funds to at least partially pay for the subject construction by using money paid by the two facilities at which the construction was to take place. Had the money been used for construction instead of being paid to CCI, less borrowing would have been needed. In this regard, the court rejects CCI's argument that each of its facilities is a separate entity and that the earnings of some facilities cannot be used to offset the obligations of others. As was true with CCI's failure to more efficiently pay salaries to avoid excess FICA taxes, CCI has an affirmative duty, at least when it seeks reimbursement from the public trough, to more efficiently handle its finances. Thus, whether each facility is or is not a separate legal entity, they are all controlled by CCI, and CCI could have accomplished the construction at Colonial Heights and Valley at a lesser cost by using the money from those facilities and the money from its other facilities more wisely. Because CCI paid more interest than was prudent, the court affirms DMAS on this issue.

## B. *Taxes*

DMAS has agreed that distributions to pay the income tax liabilities of CCI's owners was appropriate. There is still a dispute, however, on what amount of payment is proper. According to CCI, DMAS' calculations were based on an assumption that the shareholders had no other income, even though there was evidence that Mr. Seal, at least, did have other income. To the extent DMAS' calculations were based on faulty assumptions, they must be redone. Accordingly, the court will remand this issue to DMAS

with instructions to calculate CCI's reimbursable tax payments based on the actual tax situations of the individual shareholders involved.

### C. *Dividends*

DMAS determined that $4 million in dividends was paid by CCI to its shareholders while the construction loans were being made and repaid. That money, according to DMAS, should have been used for the construction. On the other hand, CCI argues that there were no dividends paid at all, except to the extent that the tax payments already discussed can be called dividends. The record in this regard is confusing.

CCI is a "Subchapter S" corporation. Such corporations do not declare dividends. They can, however, voluntarily have shareholder distributions. Whether or not they make distributions, the profit and loss associated with the corporation are taxed to the shareholders. CCI was profitable. While DMAS' final decision states that $4 million was distributed to shareholders from 1987 through 1988, the court is unable to find any specific mention of such distributions in the record. Accordingly, the court agrees with CCI that such distributions were "paper" distributions only and should not have been used to reduce the amount of reimbursement for the interest payments made by CCI.

### D. *Journal Entry*

The parties also disagree about a $225,000 journal entry. According to CCI, the entry is not a distribution, but is a bookkeeping entry to offset an earlier entry. The two entries net each other out to $0 in income and expense. As such, CCI argues, it should not be listed among the "unnecessary" distributions made by the facilities under construction during the relevant time period. The director held that the argument presented by CCI to the hearing officer was insufficient to explain the entry and that, in any event, it was unclear what effect this figure had on the total calculations made by DMAS. The director remanded the issue to the Financial Operation Division of DMAS with instructions to reevaluate it. As DMAS has not made a final determination on this issue, the court has nothing to review. The court cannot supplant the agency's authority by determining the exact nature of the entry on appeal. Accordingly, the court will affirm the director's decision to remand.

### 3. *Medical Director Compensation*

When CCI purchased the Valley facility, Dr. William Greever was Valley's medical director and the chairman of its utilization review commit-

tee. According to CCI, a replacement was sought for Dr. Greever, but none could be found. CCI points to the remote location of the facility and the relatively low number of physicians in the area as explanations for this. In any event, Dr. Greever was kept in both positions and a salary of $1,000 per month, which CCI allocated $500 to each position, was agreed to.

The Medical Nursing Home Manual is used by DMAS as a reference in determining reasonable salary reimbursement. The Manual's fee schedule for medical directors ranged from $6,204 annually in 1988, to $7,878 annually in 1993. There is no schedule in the Manual for chairmen of utilization review committees. Section 2000 of the PRM, however, calls for a "reasonable cost" for such chairmen's salaries. Since CCI allocated $500 a month, or $6,000 a year, to each of the positions held by Dr. Greever, his salary as medical director was always below the limit imposed by the Medical Nursing Home Manual and, according to CCI, was fully reimbursable by Medicaid. DMAS objected. In reviewing Dr. Greever's salary, DMAS determined that only $100 should be allocated to his services as chairman of the utilization review committee, leaving $900 per month, or $10,800 a year, allocated to the medical director's position. Thus, his salary for that position exceeded the Medicaid-imposed limit and, to that extent, reimbursement was denied. As justification for its conclusion, DMAS noted that CCI paid only $100 to another member of the same utilization review committee, and that in a previous appeal involving the same facility, although under different management, Dr. Greever's allowable compensation as a member of the committee was set at $100 a month. Thus, according to DMAS, $100 a month is an appropriate figure to use for Dr. Greever's salary as chairman of the committee, meaning that $900 a month, which is more than the Medical Nursing Home Manual limit, is allocated to his job as medical director. The court will not disturb that finding.

As discussed earlier in this opinion, an agency decision will be reversed only if it is arbitrary and capricious or if there is not sufficient evidential support in the record for the decision. Neither of those situations exists with regard to this issue. In making its decision, DMAS did not arbitrarily adopt a salary figure for the medical director's job at Valley. Instead, it looked to see what other members of the utilization review committee were paid, and at what Dr. Greever himself was paid prior to being employed by CCI. While the parties disagree on what that information means, it cannot be said that "considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion." *Virginia Real*

*Estate Comm. v. Bias, supra*, 226 Va. at 269 (*quoting* B. Mezines, *Administrative Law*, § 51.01 (1981) (emphasis in original)). Accordingly, DMAS' finding will be affirmed.