**Fairfax**

W. HEYWOOD FRALIN, EXECUTOR OF THE ESTATE
OF HORACE G. FRALIN, DECEASED, et al.

v.

BRUCE U. KOZLOWSKI, DIRECTOR OF
DEPARTMENT OF MEDICAL ASSISTANCE SERVICES,
et al.

No. 0289-93-3

Decided July 26, 1994

M. Caldwell Butler (Neil V. Birkhoff; Frank K. Friedman; Woods, Rogers & Hazlegrove, on briefs), for appellants.

Roger L. Chaffe, Senior Assistant Attorney General (Stephen D. Rosenthal, Attorney General; Pamela M. Reed, Assistant Attorney General; Ternon G. Burton; Assistant Attorney General, on brief), for appellees.

OPINION

**FITZPATRICK, J.**—The sole issue in this appeal is whether a related third-party builder may recover a return on equity capital invested during the initial construction of a Medicaid provider nursing facility. Fralin argues that the trial court erred in upholding the Virginia Department of Medical Assistance's ("DMAS") decision to deny Medicaid reimbursement to Medical Facilities of America ("MFA") for return on equity capital used by MFA's related third-party builder, Fralin, in the construction of nursing facilities for MFA between 1982-1986. Finding no error, we affirm.

## BACKGROUND

Fralin is a Virginia corporation related to a number of partnerships that own and operate twelve nursing home and intermediate care facilities under the name of Medical Facilities of America (MFA). Each is a separate partnership, and all are Medicaid providers enrolled under the Virginia State Plan for Medical Assistance. As a Medicaid provider, each MFA partnership is reim-

bursed by the Commonwealth for its reasonable costs incurred while providing care to Medicaid patients. Among the reasonable costs allowed providers is the cost of acquiring facilities.

The Virginia Medicaid program is authorized under the federal Medicare statute. It is governed by a comprehensive statutory scheme structured to reimburse reasonable costs incurred by qualified providers of health services to Medicare and Medicaid patients. The applicable portion of the federal statute (42 U.S.C. § 1395x(v)[1]) is further defined by the implementing regulations (42 C.F.R. § 413 *et seq.*) developed by the Health Care Financing Administration ("HCFA"), the federal agency responsible for administering the Medicare Program. HCFA also prepares and disseminates the Provider Reimbursement Manual ("the PRM"), which is an interpretive guideline designed to facilitate the management of reimbursement under the Medicare Program.[2]

Virginia's Medicaid Program is funded by both the state and federal governments and contracts with individual health care providers such as MFA for needed services. Pursuant to Virginia Code §§ 32.1-323 to 32.1-331.17, DMAS is responsible for developing its own reimbursement system, which must meet specified federal requirements. To fulfill this obligation, DMAS prepares the Nursing Home Payment System ("NHPS"), to establish and outline the Commonwealth's approach to Medicaid

---

[1] The relevant provisions of 42 U.S.C. § 1395x(v), "Reasonable costs," read as follows:

(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the methods or method to be used, and the items to be included, in determining such costs for various types or classes of services; . . . .

(B) Such regulations in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services.

[2] The legal status of the PRM, formerly referred to as HIM-15, has been described as follows:

The [PRM] is a guide for intermediaries in applying the Medicare statute and reimbursement regulations and does not have the binding effect of law or regulation.

*Phoenix Baptist Hosp. & Medical Ctr. v. Heckler*, 767 F.2d 1304, 1307 (9th Cir.), *opinion modified, reh'g denied*, 776 F.2d 877 (9th Cir. 1985). While advisory, the PRM remains a valid source of information for parties to use in determining reimbursement of reasonable costs for MFA and Fralin.

reimbursement.

Under Virginia's Medicaid Program, providers are required to submit cost reports to DMAS at the conclusion of each provider's fiscal year. These reports must include in detail the total cost of patient care in the facilities, plant costs, and operating costs. The MFA facilities previously requested and received Medicaid reimbursement as qualifying providers. Each MFA partnership uses all or part of the completed facility for the provision of nursing care to Medicaid patients.

In the initial cost reports filed by MFA for the years at issue, each MFA facility included a monetary claim designated as builder's profit relating to the cost to MFA of acquiring the facilities from Fralin. When DMAS disallowed those claims for builder's profit, MFA then requested reimbursement for return on equity invested by their related builder, Fralin, as part of its reimbursable costs.[3] DMAS also denied this request for reimbursement, relying chiefly on its interpretation of the applicable sections of the PRM.

An informal fact finding conference upheld the DMAS's decision. MFA appealed. After a formal administrative hearing, the hearing officer also recommended that the return on equity reimbursement be denied. On November 27, 1991, the Director of DMAS issued a final agency decision, adopting the hearing officer's recommendations with minor modifications and denying this element of reimbursement. MFA appealed DMAS's final decision to the trial court pursuant to the Virginia Administrative Process Act, Code §§ 9-6.14:1 to 9-6.14:25. The trial court upheld the Director's decision and this appeal followed.

## STANDARD OF REVIEW

■ In *Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 369 S.E.2d 1 (1988), we outlined the review process of Code § 9-6.14:17 as follows:

---

[3] The parties stipulated as follows:

"The MFA facilities and F&W (Fralin) are 'related organizations' within the meaning of the statutes, regulations and policy concerning provider reimbursement under both Medicare and Medicaid."

These separate standards of review dictate the degree of deference, if any, to be given to an agency's decision on appeal. Where the issue is whether there is substantial evidence to support findings of fact, great deference is to be accorded the agency decision. Where the issue falls outside the specialized competence of the agency, such as constitutional and statutory interpretation issues, little deference is required to be accorded the agency decision. *Where, however, the issue concerns an agency decision based on the proper application of its expert discretion, the reviewing court will not substitute its own independent judgment for that of the agency but rather will reverse the agency decision only if that decision was arbitrary and capricious.* Finally, in reviewing an agency decision, the courts are required to consider the experience and specialized competence of the agency and the purposes of the basic law under which the agency acted.

*Id.* at 246, 369 S.E.2d at 9 (emphasis added).

DMAS is the Virginia agency charged with administering the state's Medicaid program. *See* Code §§ 32.1-323 *et seq.* DMAS possesses the requisite experience and competence necessary to determine the reimbursement due qualified providers for their reasonable costs incurred while delivering health care services. As such, its interpretations of the statutes and regulations governing Medicaid and Medicare principles of reimbursement are entitled to deference by a reviewing court and should only be overturned when found to be arbitrary and capricious.

### INCORPORATION PURSUANT TO CODE § 9-6.15

Fralin first contends that because DMAS failed to incorporate properly the Provider Reimbursement Manual into the NHPS, as required by the Virginia Register Act, Code §§ 9-6.15 to 9-6.22, DMAS's reliance on PRM provisions is impermissible. We agree that DMAS did not fully comply with the procedural requirements of the Virginia Register Act and, thus, failed to incorporate by reference the PRM.[4] However, DMAS's failure to incorporate the PRM is not dispositive of this case.

---

[4] *See* Code § 9-6.14:17(iii).

■ The Virginia Register Act requires state agencies to file with the Registrar of Regulations copies of textual materials adopted by reference in state regulations and to make such materials available to the public for review and copying.[5] The purpose of these detailed procedural requirements is "to satisfy the need for public availability of information respecting the regulations of state agencies." Code § 9-6.15.

Although DMAS failed to formally incorporate the PRM into its NHPS manual, the language of the manual indicates that the agency intended to utilize the federal policy manual to calculate reimbursements for reasonable costs. The introduction to the NHPS manual states:

> The cost report data used in the rate calculation shall be only those allowable, reasonable cost items which are acceptable under *the Medicare principles of reimbursement,* except as modified herein.

(Emphasis added). The NHPS manual makes an additional reference to following the "Medicare guidelines" when computing return on equity allowances for proprietary providers.[6]

The record establishes that MFA and Fralin were aware of and possessed copies of the PRM. Fralin has, in fact, based portions of its argument on interpretations of specific provisions of the PRM. For example, in its brief Fralin refers to the PRM in support of its position.[7]

---

[5] Where regulations adopt textual matter by reference to publications other than the Federal Register or the Code of Federal Regulations, the agency shall (i) file with the Registrar copies of such referred publications, (ii) state on the face of or as notations to regulations making such adoptions by reference the places where copies of the referred publications may be procured, and (iii) make copies of such referred publications available for public inspection and copying along with its other regulations. Code § 9-6.18.

[6] On page 12, the 1982 NHPS manual states:
The allowance for return on equity for proprietary providers shall be ten percent of equity capital computed in accordance with Medicare guidelines.

[7] "Additionally, the agency guidelines, the Provider Reimbursement Manual, were issued which, unlike the statute and the regulations, do not have the force or effect of law. . . . The statute, the regulations and the *guidelines* all support MFA's position that return on equity invested in Medicaid nursing home facilities is a reimbursable cost." (emphasis added).

Moreover, MFA entered into a contract with the Medicaid program and, pursuant to federal and state law, agreed to comply with and accept reimbursement in accordance with DMAS's reimbursement regulations and policies. These regulations are incorporated by reference into each provider agreement and signed annually by each provider. MFA agreed to participate in the program and was fully aware that the PRM was to be utilized.

Finally, the record supports the conclusion that both parties relied on the PRM as a definitive source of information regarding reasonable cost reimbursement questions. A January 1988 letter from the Virginia Attorney General's office to counsel for Fralin, outlining a settlement agreement concerning an earlier reimbursement dispute, makes clear that Fralin recognized the applicability of the PRM provisions as valid interpretive guidelines under Virginia's Medicaid Program.[8]

## PRM

Virginia's 1982 NHPS manual provides no clear guidance on the issue at bar. While the NHPS describes the appropriate return on equity capital as "10% of equity capital computed in accordance with Medicare guidelines," NHPS contains no definitive statement concerning whether return on equity capital invested during initial facility construction may be included as a reimbursable cost. Therefore, in denying payment to MFA, DMAS properly exercised its authority to resolve this question in a manner consistent with Medicare principles of reimbursement by turning to the PRM for clarification.

PRM Chapter X, "Costs to related organizations," delineates the provisions for reimbursing related parties consistent with 42 C.F.R. § 413.17 ("Costs to related organizations").[9] PRM-15 § 1005 provides, in part:

---

[8] "MFA shall make application to the Department pursuant to § 1005, (PRM-15), for reimbursement of the actual direct and indirect overhead costs incurred as a result of the construction of the above referenced five facilities."

[9] Fralin and MFA have stipulated that they constitute "related parties" in this situation. See supra note 3. The purpose of the related party provisions is to prevent "sweet heart" deals between business parties designed to frustrate Medicare principles to only reimburse for legitimate "costs" associated with providing care to patients. See 42 C.F.R. § 153(c).

> The related organization's costs include all reasonable costs, direct and indirect, incurred in the furnishing of services, facilities, and supplies to the provider. The intent is to treat the costs *incurred by the supplier as if they were incurred by the provider itself. . . .* In situations where the provider is a proprietary organization (as defined in § 1202.4), an allowance of a reasonable return on equity capital invested and used in furnishing services, facilities and supplies to the related provider is includable as an element of the reasonable cost of the related organization.

However, these provisions are conditioned by PRM-15 § 1218, "Exclusions from equity capital." PRM-15 § 1218.4 states:

> *Construction-in-process and liabilities related* to such construction *are not includable in equity capital.*

(Emphasis added). MFA stipulated as follows:

> [Had] MFA partnerships constructed the facilities in issue themselves using their own funds, the MFA partnerships under § 1218.4 of the PRM-15, would not have been entitled to reimbursement for the return on equity invested in the construction of those facilities during the period that such facilities were under construction and not being used to provide patient care.

Although federal courts have concluded that return on equity capital is a reasonable cost under certain circumstances and, therefore, reimbursable, they have not dealt directly with the question of whether return on equity capital during the construction period is reimbursable. *See Humana of S.C., Inc. v. Mathews*, 419 F. Supp. 253 (D.D.C. 1976), *aff'd in part and rev'd in part*, 590 F.2d 1070 (D.C. Cir. 1978) (recognizing the legitimacy of return on equity claims as a reimbursable cost); *Stevens Park Osteopathic Hosp., Inc. v. United States*, 633 F.2d 1373 (Ct. Cl. 1980) (court identified return on equity capital invested as a cost of attracting capital); *Sunshine Health Systems, Inc. v. Bowen*, 842 F.2d 1097 (9th Cir.), *cert. denied*, 488 U.S. 965 (1988) (supporting intention under 42 U.S.C. § 1395x(v)(1)(B) to include return on equity as a reimbursable cost). These cases stand for the principle that return on equity capital is a reimbursable cost when

capital is invested while the facility is already providing care, but do not address the question of whether such investments are reimbursable when made during construction of new facilities. *See also National Medical Enters. v. Bowen*, 851 F.2d 291 (9th Cir. 1988) (holding return on equity capital as a reimbursable cost *when* hospitals are providing services to patients).

In *National Medical Enterprises*, the United States Court of Appeals for the Ninth Circuit held:

> For-profit hospitals earn return on equity as part of their costs when these hospitals provide services to Medicare patients. Thus, return on equity is earned in the *current* cost-reporting period and, according to the principles of accounting, should be reported in that period.

*Id*. at 293 (emphasis added).

The *National Medical Enterprises* decision supports DMAS's interpretation that the Medicare statute and regulations do not allow reimbursement of return on equity capital invested by a related-party builder during the construction phase. A return on equity is allowed a related third-party builder when the investment is made by a provider who is already delivering patient care to Medicaid patients. MFA concedes that, had it constructed the facilities, it would not have been eligible for reimbursement prior to the time it began to treat patients. Here, MFA improperly attempted to gain reimbursement unavailable to them had they built the nursing home facilities themselves.

Because the trial court's decision upholding DMAS's denial of payment to Fralin is consistent with Medicare principles of reimbursement, its decision was not arbitrary or capricious and must be affirmed.

*Affirmed.*

Coleman, J., and Willis, J., concurred.