COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Elder and Fitzpatrick
Argued at Richmond, Virginia


BEVERLY HEALTH AND REHABILITATION
 SERVICES, INC.
                                        OPINION BY
v.        Record No. 1757-96-2     JUDGE LARRY G. ELDER
                                        APRIL 22, 1997
ROBERT C. METCALF, DIRECTOR, VIRGINIA
 DEPARTMENT OF MEDICAL ASSISTANCE SERVICES


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Theodore J. Markow, Judge

            Peter M. Mellette (Jeannie A. Adams; Crews &
            Hancock, on briefs), for appellant.

            E. Paige Selden, Assistant Attorney General
            (James S. Gilmore, III, Attorney General;
            William H. Hurd, Deputy Attorney General;
            Siran S. Faulders, Senior Assistant Attorney
            General, on brief), for appellee.



        Beverly Health and Rehabilitation Services, Inc. (appellant)

appeals the decision of the Circuit Court of the City of Richmond

(circuit court) affirming the decision of the Director of the

Virginia Department of Medical Assistance Services (DMAS) denying

appellant's request for reimbursement from the Medicaid program

of certain depreciation and interest expenses.  Appellant

contends that DMAS erroneously reversed a hearing officer's

recommendation and that DMAS' interpretation of applicable

regulations was arbitrary and capricious.  For the reasons that

follow, we affirm in part, reverse in part, and remand.

I.

BACKGROUND

Appellant is a Delaware corporation that operates nursing facilities, retirement living centers, home health agencies and pharmacies throughout the United States. Appellant is also a provider under the Medicaid program who operates several nursing facilities in Virginia. DMAS is the state agency authorized to administer Virginia's Medicaid program.

In the years relevant to this appeal, appellant claimed reimbursement from DMAS for two types of expenses. The first claim was for interest expense and depreciation related to four facilities (REIT facilities) leased to appellant by Nationwide Health Properties, Inc. (Nationwide). The other claim was for interest expense arising from a revolving line of credit (revolving debt) that was initially obtained by appellant at its corporate level. A portion of the interest expense from the revolving debt was allocated to each of appellant's facilities in Virginia, and appellant sought reimbursement from DMAS for these interest expenses.

Following an audit of appellant's cost reports for the years relevant to this appeal, DMAS adjusted appellant's reports to exclude these interest expenses and depreciation as allowable costs under the Medicaid program. The Director of DMAS' Division of Cost Settlement and Audit held an informal fact finding conference and upheld these adjustments. Appellant appealed, and

a hearing officer appointed by DMAS recommended reversing the adjustments and allowing the reimbursement of the depreciation and interest expense sought by appellant. Appellant filed exceptions, and the Director of DMAS (DMAS director) rejected the hearing officer's recommendation. He held that DMAS was correct when it adjusted appellant's cost reports to deny reimbursement to appellant for the depreciation and interest expenses associated with the REIT facilities and the interest expense arising from the revolving debt. Appellant appealed, and the Circuit Court of the City of Richmond affirmed the decision of the DMAS director.

II.

THE DMAS DIRECTOR'S REVIEW

OF THE HEARING OFFICER'S WRITTEN RECOMMENDATION

Appellant initially contends that the DMAS director's decision should be reversed on procedural grounds. It argues that the DMAS director lacked the power to reject the hearing officer's recommendation because DMAS did not file timely exceptions. In the alternative, appellant argues that the DMAS director did not accord sufficient deference to the hearing officer's factual findings.

The record establishes that the hearing officer recommended allowing the costs associated with both the REIT facilities and the revolving debt and based his recommendation upon the exhibits and testimony of the parties. The hearing officer did not make any credibility determinations based on recorded observations of

the witnesses' demeanor.  The DMAS director rejected the hearing officer's recommendation based on several legal grounds, including the hearing officer's refusal to qualify a DMAS witness as an expert, the hearing officer's admission that he did not review the entire record, his reliance upon informal case decisions as precedent, and his erroneous application of the Medicare principles of reimbursement.  The DMAS director also stated that appellant had excepted to the hearing officer's recommendation while DMAS had failed to file timely exceptions.

Administrative proceedings before DMAS are governed by the Administrative Process Act (APA), DMAS regulations known as the "state plan for medical assistance"[1] and applicable federal law.  See Code § 32.1-325.1.  Federal regulations require DMAS to:

> provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates.

42 C.F.R. § 447.253(e).  The NHPS satisfies this federal requirement by providing for two levels of administrative review: an informal proceeding and a formal hearing.  See 12 V.A.C. § 30-90-130(III).  After DMAS makes an informal decision, the provider may request a formal hearing.  Upon such a request, the

---

[1] The portion of the state plan relevant to the issues in this case is called the Nursing Home Payment System (NHPS).  Several versions of the NHPS have existed over the years and the current version is codified at 12 V.A.C. § 30-90-10 et seq. (1996).

DMAS director appoints a hearing officer who is authorized to conduct the formal hearing and to "make a written recommendation." Id. § 30-90-130(III)(C).

Under the APA, the hearing officer's decision is subject to agency review in two instances: first, if a party files "exceptions thereto," Code § 9-6.14:12(D), or second, if:

> the agency shall by its procedural regulations provide for the making of findings and an initial decision by [a hearing officer] subject to review and reconsideration by the agency . . . on its own motion.

Id. § 9-6.14:12(C). The NHPS authorizes the DMAS director to broadly review a hearing officer's recommendation. In fact, the NHPS characterizes the DMAS director's final decision as distinct from the recommendation of the hearing officer. 12 V.A.C. § 30-90-130(III)(E) states that "[t]he director shall notify the provider of his final decision within 30 business days of the date of the appointed hearing officer's written recommendation . . . . " (Emphasis added). Thus, under the NHPS, the recommendation of a hearing officer is just that -- a recommendation, and the DMAS director may reexamine all of the hearing officer's conclusions. Regarding a hearing officer's factual findings, the DMAS director is required by the APA to defer to findings in the hearing officer's recommendation that are "explicitly based on the demeanor of witnesses." Code § 9-6.14:12(C).

-5-

We hold that the DMAS director did not exceed his authority when he reviewed and rejected the hearing officer's recommendation. Even though DMAS failed to file timely exceptions, the DMAS director was empowered to review all of the hearing officer's conclusions based on both the exceptions filed by appellant and on his own motion. In addition, contrary to appellant's assertion, the DMAS director is authorized to reject the factual findings of the hearing officer that are not based on the hearing officer's express observations of the demeanor of the witnesses. In this case, the hearing officer did not state in his recommendation that any of his factual findings were based upon his observation of the witnesses' demeanor. Thus, the DMAS director did not exceed his power to review the hearing officer's recommendation.[2]

III.

INTEREST EXPENSE AND DEPRECIATION RELATED TO REIT FACILITIES

Appellant contends that the DMAS director arbitrarily and capriciously interpreted Medicaid regulations to reach his conclusion that the interest expense and depreciation related to

---

[2] Appellant also contends that the DMAS director violated the APA when he failed to rule upon appellant's exceptions to the hearing officer's written recommendation. However, the substance and nature of appellant's exceptions were not included in either the joint appendix or the record received from the circuit court. Therefore, we are unable to consider this argument on appeal. See Jenkins v. Winchester Dep't of Social Servs., 12 Va. App. 1178, 1185, 409 S.E.2d 16, 20 (1991) (stating that "[t]he burden is upon the appellant to provide [this Court] with a record which substantiates the claim of error").

the REIT facilities are not allowable costs.

In reviewing decisions by DMAS, an appellate court accords great deference to both the agency's factual findings and interpretation of the laws applicable to "the reimbursement due qualified providers for their reasonable costs incurred while delivering health care services." Fralin v. Kozlowski, 18 Va. App. 697, 700-01, 447 S.E.2d 238, 240-41 (1994). This Court will overturn DMAS' "interpretations of the statutes and regulations governing Medicaid and Medicare principles of reimbursement . . . only . . . when found to be arbitrary and capricious." Id. at 701, 447 S.E.2d at 241.

### A.

Prior to 1985, appellant leased the REIT facilities from Kellett Corporation (Kellett). Kellett was not a participant in the Medicaid program and was not "related" to appellant. In early September, 1985, Kellett sold the REIT facilities, along with nineteen other nursing facilities, to appellant. Each REIT facility had an outstanding mortgage debt attached to it. As part of the consideration for its purchase, appellant assumed the mortgages for three of the REIT facilities and paid off the outstanding debt on the fourth.

On October 25, 1985, Nationwide was incorporated as a real estate investment trust (REIT).[3] At all times relevant to this

---

[3] Nationwide was initially called Beverly Investment Properties, Inc.

appeal, appellant owned five percent of Nationwide's issued and outstanding stock, and the two are "related" for Medicaid reimbursement purposes. By December 30, 1985, appellant either paid off or defeased the remaining three mortgages it had assumed as part of its purchase of the REIT facilities. On December 31, 1985, appellant sold the REIT facilities to Nationwide pursuant to a "sale/leaseback" transaction. Appellant leased the REIT facilities from Nationwide during the subsequent fiscal years relevant to this appeal.

Appellant sought reimbursement from DMAS for the expenses associated with the REIT facilities. Specifically, appellant sought reimbursement for depreciation of the facilities on a "stepped-up" basis equal to the purchase price it paid Kellett for the REIT facilities. It also sought reimbursement for the "interest expense" related to the lease payments it made to Nationwide.

DMAS refused to allow the reimbursement sought by appellant. Regarding depreciation, DMAS allowed reimbursement to appellant based on Kellett's basis in the REIT facilities and not appellant's "stepped-up basis." In upholding this adjustment, the DMAS director stated that § (A)(5)(b)(9) of the then-applicable version of the NHPS prohibited appellant from collecting reimbursement for depreciation on a "stepped-up" basis. See NHPS § (A)(5)(b)(9) (1982 & Supp. 1984). Section (A)(5)(b)(9) states:

> Effective October 1, 1984, the valuation of
> an asset of a hospital or long term care
> facility which has undergone a change of
> ownership on or after July 18, 1984, shall be
> the lesser of the allowable cost to the <u>owner
> of record</u>, or the acquisition cost to the new
> owner.
>
> In the case of an asset <u>not in existence</u> as
> of July 18, 1984 the valuation of an asset of
> a hospital or long-term care facility shall
> be the lesser of the first owner of record,
> or acquisition cost to the new owner.
>
> In establishing an appropriate allowance for
> depreciation . . . the asset basis to be used
> for such computations shall be limited to the
> valuation above.

(Emphasis added).  The DMAS director reasoned that the REIT facilities were in existence as of July 18, 1984 and, citing <u>Black's Law Dictionary</u>, held that the plain, meaning of "owner of record" is "the owner of title at the time of notice."  The DMAS director concluded that appellant's basis in the REIT facilities for depreciation purposes was limited to Kellett's basis because Kellett was the owner of record on July 18, 1984 and its basis in the REIT facilities was less than the acquisition cost to appellant.  Furthermore, the DMAS director held that the sale/leaseback transaction between appellant and Nationwide did not change the allowable reimbursement for depreciation.  The DMAS director reasoned that appellant would continue to be reimbursed for the allowable depreciation that existed prior to the sale/leaseback because this transaction was between related parties.

-9-

Regarding the lease-related interest expense, DMAS disallowed reimbursement to appellant for any interest expense incurred after the sale of the REIT facilities to Nationwide. In upholding this adjustment, the DMAS director cited § (c) of Appendix II in the NHPS, which stated:

> Interest - Interest expense will be limited
> to actual expense incurred by the owner of
> the facility in servicing long-term debt
> . . . .

NHPS app. II, § (c) (1982). He reasoned that the only long term debt serviced by appellant in its acquisition of the REIT facilities from Kellett was the three mortgages it assumed and paid off or defeased prior to the sale of these facilities to Nationwide. Because this long term debt ceased to exist, appellant no longer incurred any "actual interest expense" related to long term debt that was allowable under the NHPS.

### B.

The DMAS director "is authorized to administer [the] state plan and to . . . expend federal funds therefor in accordance with applicable federal and state laws and regulations . . . ." Code § 32.1-325(B). Under the NHPS, DMAS may only reimburse providers for "those allowable, reasonable cost items which are acceptable under Medicare principles of reimbursement, except as modified herein . . . ." NHPS, Introduction (1982). Thus, under the NHPS, when DMAS considers the reimbursement of an expense claimed by a provider in a cost report, it must first apply DMAS

regulations that pertain to the particular expense.  If the NHPS is silent on a particular expense or issue, then DMAS is required to apply Medicare principles of reimbursement, including those stated in the Provider Reimbursement Manual.  See State Plan Under Title XIX of the Social Security Act, Attachment 4.19-D(d)(2) (stating that "[t]he determination of allowable costs will be in accordance with Medicare principles as established in the Provider Reimbursement Manual . . . except where otherwise noted in this Plan").[4]

We hold that the DMAS director's denial of appellant's request to allow depreciation of the REIT facilities on a "stepped up" basis was based on an arbitrary and capricious interpretation of the relevant Medicaid regulations. Specifically, the DMAS director declined to apply federal regulations defining which facilities were "not in existence" as of July 18, 1984 for the purposes of determining the allowable depreciation cost.  The DMAS director correctly stated that § (A)(5)(b)(9) of the 1982 NHPS applied to the transactions involving the REIT facilities.  However, § (A)(5)(b)(9) is silent on the issue of which facilities "existed" as of July 18, 1984

---

[4] We have described the Provider Reimbursement Manual (PRM) as "a guide for intermediaries in applying the Medicare statute and reimbursement regulations [that] does not have the binding effect of law or regulation."  Fralin, 18 Va. App. at 699 n.2, 447 S.E.2d at 240 n.2.  This statement does not describe the legal effect of the PRM in all cases.  In this case, DMAS is bound by the state plan to apply any relevant provisions of the PRM when the NHPS is silent on a particular reimbursement issue.

for purposes of establishing the proper basis of depreciation. Medicare principles of reimbursement, as stated in Federal regulations, speak to this issue. 42 C.F.R. § 413.134(b)(1)(ii)(B) states that "an asset not in existence as of July 18, 1984 includes any asset that physically existed, <u>but was not owned by a hospital or [skilled nursing facility] participating in the Medicare program as of July 18, 1984</u>." (Emphasis added).

If the DMAS director had properly applied Medicare principles of reimbursement as required by the NHPS, he could not have concluded that appellant's basis of depreciation in the REIT facilities was limited to Kellett's basis before the facilities were sold. Although Kellett owned the REIT facilities prior to July 18, 1984, it did not participate in the Medicare or Medicaid program. Thus, for the purposes of calculating depreciation under § (A)(5)(b)(9) of the 1982 NHPS, the REIT facilities were not in existence as of July 18, 1984. <u>See</u> 42 C.F.R. § 413.134(b)(1)(ii)(B). Instead of analyzing the REIT facilities under the first paragraph of § (A)(5)(b)(9), the DMAS director should have applied the second paragraph of § (A)(5)(b)(9), which states:

> In the case of an asset not in existence as of July 18, 1984 the valuation of an asset of a hospital or long-term care facility shall be the lesser of the first owner of record, or acquisition cost to the new owner.

The REIT facilities did not "exist" until they were acquired by

appellant.  Thus, appellant was the first owner of record and its basis in the REIT facilities for depreciation purposes should have been its acquisition cost.  Because the DMAS director declined to apply relevant Medicare principles of reimbursement, he acted arbitrarily and capriciously when he concluded that appellant was not entitled to reimbursement for depreciation of the REIT facilities on a "stepped-up" basis.

C.

We also hold that the DMAS director incorrectly applied Medicaid and Medicare regulations to the interest expense arising from appellant's lease payments on the REIT facilities but that the DMAS director reached the right result for the wrong reason. "We do not hesitate, in a proper case, where the correct conclusion has been reached but the wrong reason given, to sustain the result and assign the right ground."  Robbins v. Grimes, 211 Va. 97, 100, 175 S.E.2d 246, 248 (1970).

Although the DMAS director correctly applied § (A)(5)(b)(9) of the 1982 NHPS to the depreciation of the REIT facilities, the DMAS director erroneously failed to determine that this section applies to any interest expense arising from the sale/leaseback transaction as well.  Section (A)(5)(b)(9) states that:

> Reimbursement for rental charges in sales and leaseback agreements shall be restricted to the . . . interest . . . as computed above (cost of ownership).

As previously discussed, the REIT facilities did not exist as of July 18, 1984, and the second paragraph of § (A)(5)(b)(9) applies to the calculation of the costs of ownership of these facilities.  This paragraph states:

> In the case of an asset not in existence as of July 18, 1984 the valuation of an asset of a hospital or long-term care facility shall be the lesser of the first owner of record, or the acquisition cost to the new owner.

Interest expense regarding leased facilities is defined elsewhere

in the NHPS as "actual expense incurred by the owner of the facility in servicing long-term debt . . . ."  NHPS app. II, § (c) (1982).

Under these provisions of the NHPS, the DMAS director correctly disallowed appellant any reimbursement for interest expense arising from its lease payments on the REIT facilities to Nationwide.  Appellant was the "first owner of record" of the REIT facilities.  The record establishes that, prior to the sale/leaseback transaction with Nationwide, appellant either paid off or defeased all of the long term debt it assumed pursuant to its purchase of the REIT facilities from Kellett.  Thus, at the time of the sale/leaseback transaction, appellant no longer incurred any interest expense arising from its acquisition of the REIT facilities.  Although the record does not establish the exact amount of interest expense incurred by Nationwide to acquire the REIT facilities, we can assume that this amount was greater than the interest expense incurred by appellant at the time of the sale/leaseback transaction -- zero.  Because the interest expense of "the first owner of record" (appellant) was less than the interest expense incurred by the subsequent purchaser/lessor (Nationwide), the DMAS director did not act arbitrarily and capriciously when he disallowed appellant reimbursement of any interest expense arising from this transaction.

Appellant contends that the NHPS was silent on the issue of

sale/leaseback transactions and that the DMAS director arbitrarily ignored applicable Medicare principles of reimbursement.  However, as previously discussed, the NHPS contains a provision that applies to sale/leaseback transactions.  Thus, the DMAS director was not required to apply any other Medicare principles of reimbursement.  In addition, the only Medicare principle of reimbursement cited by appellant, PRM § 110, does not apply to the transaction between appellant and Nationwide.  Section 110 states that it applies only to sale/leaseback transactions between a provider and a "nonrelated purchaser."  The record establishes that appellant and Nationwide were related parties at the time of their transaction.  We cannot say that the DMAS director acted arbitrarily or capriciously when he declined to apply PRM § 110.

IV.

INTEREST EXPENSE ARISING FROM THE REVOLVING DEBT

Appellant contends that the DMAS director arbitrarily and capriciously interpreted Medicaid regulations when he denied reimbursement to appellant for the interest expenses arising from the portions of the revolving debt allocated to its facilities in Virginia.  We disagree.

A.

The record indicates that on February 18, 1987, appellant executed a complex, revolving line of credit agreement that had a $400,000,000 limit.  In 1989, appellant borrowed funds from the

revolving line of credit due to cash flow problems that appellant was experiencing at many of its facilities across the country. When it decided to incur this revolving debt, appellant based its decision on its "total corporate need" and not on the needs of its individual facilities.

Appellant used its regular accounting practices and procedures to allocate portions of the interest expense arising from the revolving debt to each of its Virginia facilities. Appellant's system of accounting consolidates through monthly intercompany transfers both its cash accounts and debt accounts from all of its facilities at the corporate level. After this consolidation, appellant allocates portions of its cash and debt accounts to its individual facilities either directly or through a "home office cost report." Costs, assets, and liabilities which can be directly identified with a particular facility are allocated directly, while those that cannot are allocated through the home office cost report.

In accordance with these accounting procedures, appellant allocated portions of the interest expense from its revolving debt to each of its Virginia facilities on a monthly basis in the years relevant to this appeal. The amount allocated to each facility was approximate and based on the sum of each facility's estimated annual supply inventory and the actual amount of fixed assets purchased by that facility from January, 1988 through the current month. This sum was multiplied by one percent to obtain

the amount of interest expense allocated to each facility.

Appellant allocated portions of the revolving debt to its Virginia facilities without assessing each facility's need for working capital. Moreover, due to its corporate accounting procedures, appellant admitted that it was unable to determine whether or not its Virginia facilities had excess working capital at the time it allocated the revolving debt.

Appellant sought reimbursement from DMAS for the interest expense arising from the revolving debt that it allocated to each of its Virginia facilities. DMAS adjusted appellant's cost reports to disallow this interest expense. In upholding this adjustment, the DMAS director cited PRM § 202.1, which states that interest expense is reimbursable if it is necessary for the operation or maintenance of a provider's facilities. He then relied upon PRM § 202.2 and 42 C.F.R. § 413.153 for the proposition that interest expense is necessary if incurred to satisfy a "financial need and for a purpose reasonably related to patient care." Citing PRM § 202.2, the DMAS director also stated that interest expense is not necessary if the debt from which it arises created excess working capital for the provider.

The DMAS director then stated that neither the NHPS nor federal regulations dictate the procedure for calculating a provider's excess working capital for the purpose of determining the provider's need to borrow funds. He then held that:
> cash flow is an adequate measure of excess
> working capital. A nursing facility with

> sufficient cash flow does not need to borrow
> funds to pay for its working capital needs.

Regarding the method for calculating cash flow, the DMAS director held that the calculation should not rely on generally accepted accounting procedures (GAAP) and should instead "compare [the provider's] total revenues with its Medicaid allowable expenses." DMAS had introduced into evidence a report of the cash flow in appellant's Virginia facilities based on this method. The report showed that appellant's Virginia facilities had an aggregate positive cash flow of several million dollars during the years relevant to this appeal. Relying on this report, the DMAS director held that appellant's Virginia facilities had excess working capital at the time appellant allocated the revolving debt to them, which rendered the revolving debt unnecessary. Because the revolving debt was unnecessary, the DMAS director held that any interest expense arising from it was not an allowable cost.

### B.

We hold that the DMAS director's interpretation of Medicaid and Medicare regulations pertaining to the reimbursement of interest expense arising from the revolving debt was not arbitrary and capricious. The 1986 NHPS, which applies to the interest expense on the revolving debt, provides little guidance on reimbursement for loans that provide working capital to a facility. Appendix I of the NHPS contains a list of "allowable

expenses" that includes interest expense other than that incurred to purchase a building or equipment. See NHPS app. I, § 2.1(D)(19) (1986). The NHPS also states that in order for this interest expense to be "allowable," it must be, among other things, necessary. NHPS app. I, § 1.1(A) (1986). However, the NHPS does not indicate which interest is "necessary" and which is not. Because the NHPS is silent, the DMAS director was required to apply Medicare principles of reimbursement.

Medicare principles of reimbursement support the DMAS director's conclusion that interest expense is unnecessary, and therefore not allowable, if it is incurred by a provider to finance a debt that creates "excess" working capital at the facility claiming it as an expense. First, the federal regulation cited by the DMAS director permits reimbursement to a provider for "necessary and proper interest on both current and capital indebtedness." 42 C.F.R. § 413.153(a)(1). This federal regulation also states that interest expense is "necessary" only if it is "[i]ncurred on a loan made to satisfy a financial need of the provider. Loans that result in excess funds . . . would not be considered necessary." Id. at § 413.153(b)(2). PRM § 202.2, also cited by the DMAS director, states that "when borrowed funds create excess working capital, interest expense on such borrowed funds is not an allowable cost."

The only aspect of the DMAS director's interpretation that is not supported by the relevant authorities on Medicaid

reimbursement is the method he adopted for measuring excess working capital at a provider's facility. Both state and federal regulations and the PRM provide no guidance on this issue. The DMAS director held that whether or not a provider's facility has excess working capital should be determined by calculating its cash flow during the relevant cost reporting period. Furthermore, the DMAS director held that the measurement of cash flow should not follow GAAP but should instead be calculated by subtracting a provider's allowable expenses under the Medicaid program from its total revenues. The DMAS director reasoned that this method prevents a provider from shifting interest expenses incurred in the care of non-Medicaid patients to the Medicaid program. He explained that this method of calculating cash flow is superior to the GAAP method because it establishes whether the borrowing by the provider was necessary to enable the provider to care for its patients who are Medicaid beneficiaries.

We conclude that the DMAS director's method for calculating excess working capital was not arbitrary and capricious because it is consistent with general Medicare principles of reimbursement. Medicare principles state that one of the purposes of methods to determine reimbursable costs is to segregate costs incurred to treat program beneficiaries from costs incurred to treat patients not covered by the program. See 42 C.F.R. § 413.9(b)(1).

> The determination of reasonable cost of
> services must be based on the cost related to

> the care of Medicare beneficiaries. Reasonable cost includes all necessary and proper expenses incurred in furnishing services . . . . However, if the provider's operating costs include amounts not related to patient care . . . such amounts will not be allowable . . . .

Id. at § 413.9(c)(3). The DMAS director's method for calculating excess working capital furthers this purpose of the Medicare principles of reimbursement and is thus not arbitrary and capricious. In light of DMAS' recognized expertise in determining the reimbursement due to providers under the Medicaid program, we will not substitute our own judgment for that of DMAS. See Fralin, 18 Va. App. at 701, 447 S.E.2d at 240-41. In addition, the DMAS director's holding that the revolving debt allocated by appellant to its Virginia facilities was not "necessary" because these facilities had excess working capital is supported by credible evidence in the record.

For the foregoing reasons, we affirm in part and reverse in part the circuit court's affirmance of the DMAS director's decision. We remand this case to the circuit court for further proceedings consistent with this opinion.

<u>Affirmed in part, reversed in part, and remanded.</u>