COURT OF APPEALS OF VIRGINIA

Present: Judges Benton, Annunziata and Senior Judge Duff
Argued at Alexandria, Virginia

LIFE CARE CENTER OF
 NEW MARKET
                                            OPINION BY
v.  Record No. 2022-96-4        JUDGE JAMES W. BENTON, JR.
                                         SEPTEMBER 2, 1997
DEPARTMENT OF MEDICAL
 ASSISTANCE SERVICES

            FROM THE CIRCUIT COURT OF SHENANDOAH COUNTY
                  Perry W. Sarver, Judge Designate

            Laura G. Aaron (Mezzullo & McCandlish, on
            briefs), for appellant.

            E. Paige Selden, Assistant Attorney General
            (James S. Gilmore, III, Attorney General;
            William H. Hurd, Deputy Attorney General;
            Siran S. Faulders, Senior Assistant Attorney
            General, on brief), for appellee.


        This is an appeal from a circuit court's order affirming a

decision of the Department of Medical Assistance Services (DMAS),

which denied reimbursement for certain expenses incurred by Life

Care Center of New Market.  New Market argues that the trial

judge erred in affirming DMAS's decision to deny reimbursement

for (1) overhead expenses incurred by Life Care Construction in

building an addition to the New Market facility, and (2) certain

interest expenses incurred to finance a loan borrowed to fund the

construction project.  For the reasons that follow, we affirm, in

part, and reverse, in part, the trial judge's order.

                                I.

        New Market is a nursing facility in Virginia that is owned

and operated by Life Care Centers of America.  New Market

participates in the Medicaid program, which is administered by DMAS. As a Medicaid participant, New Market is entitled to file a cost report with DMAS and obtain reimbursement for expenses incurred in providing health care services to Medicaid recipients. Expenses properly incurred in constructing an addition to an existing facility may be reimbursed by DMAS. See Fralin v. Kozlowski, 18 Va. App. 697, 699-700, 447 S.E.2d 238, 239-40 (1994).

In March 1987, New Market obtained a certificate of need to construct a forty-two bed addition to its facility. New Market received a loan commitment in 1987 and constructed the addition in 1988 and 1989. After a field auditor for DMAS denied reimbursement for certain overhead and interest expenses incurred in the construction project, New Market appealed.

During the informal fact finding conference, New Market argued that the $73,572 paid to Life Care Construction was primarily for overhead expenses. When DMAS questioned New Market's methodology for computing overhead and its lack of supporting documentation, New Market requested and was granted additional time to submit documentation to support its claim for overhead costs. Although New Market supplied a summary chart of Life Care Construction's fees and expenses for the two years the project was under construction, it provided no documentation to support the data in the chart. The record indicates that DMAS "was concerned that . . . the overhead that was allocated to New

Market would have been disproportionate to the overhead that would be allocated to other projects that were overseen by Life Care Construction." Although James Branham, DMAS's audit supervisor, offered to assist New Market in arriving at a methodology that would be acceptable to DMAS, New Market did not pursue that offer. Instead, New Market prepared a second analysis based on revenues because it believed "that was the best available information."

New Market also argued at the informal fact finding conference that because the partnership distributions were a customary and legitimate business practice, DMAS erroneously disallowed reimbursement for interest on a portion of the loan equivalent to those distributions. DMAS asserted that the records established that New Market made distributions to the partnership accounts from the construction loan proceeds and that those loan funds therefore were not reasonably related to the delivery of patient care. Following the informal fact finding conference, the Director of the Division of Cost Settlement and Audit affirmed the original decision. New Market again appealed.

A formal hearing was held before a hearing officer appointed by the Supreme Court. The primary facts proved at the hearing are not in dispute. The testimony at the hearing proved that New Market initially entered into a contract with a local construction company to build the contemplated addition to New Market's facility. Before construction began, however, the

3

principal owner of the construction company died. Life Care Centers of America, New Market's owner, then decided to build the addition itself and formed for that purpose a new company, Life Care Construction. New Market hired Life Care Construction to build the addition. DMAS and New Market agree that Life Care Construction is a "related party," i.e., that it was under common ownership or control with New Market.

Life Care Construction employed a local contractor, Paul Thompson, who had a general contractor's license, to act as an "on-site daily superintendent" for the project. Life Care Construction "acted as owner's representative; it acted as developer." According to the testimony, Life Care Construction "studied [the project], listened to the operators of Life Care Centers of America on the needs of the addition; . . . worked with the architect; . . . designed with the architect the blueprints, helped design the specifications for the project, deciding the equipment, the finishes, [and] worked through the process of the blueprints being drawn by the architect firm." Life Care Construction also "prepared the liens for all the subcontractors, paid the bills, coordinated with equipment suppliers, the decorator and operations as it got near the end, and then turned the building over to operations when it was finished." Most of the contracts with the subcontractors were executed by Life Care Construction.

New Market's analyst, Randy Martin, who is a certified

public accountant and an employee of Life Care Centers of America, testified that New Market sought reimbursement for the overhead costs (or "indirect costs") of the project that were billed by Life Care Construction.[1]  He testified that the indirect costs of Life Care Construction were not separately incurred in relation to individual projects and that they had to be allocated among all of Life Care Construction's building projects.  To support New Market's claim for reimbursement, Martin proposed two analyses that attempted to isolate the indirect costs Life Care Construction incurred in relation to the New Market construction project.  In those analyses, which were based on revenues that Life Care Construction received, Martin attempted to eliminate any profits from the analysis because DMAS will not permit reimbursement for profits earned by a related party.

In the first calculation, Martin determined that two percent of Life Care Construction's total revenues for the year represented profits.  Martin then determined the amount of profits earned on the New Market project by multiplying by two percent the total revenues received from New Market.  After

---

[1] "[O]verhead costs are those that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract."  Altmayer v. Johnson, 79 F.3d 1129, 1132 (Fed. Cir. 1996); see also Alvey Conveyor Mfg. Co. v. Kansas City Terminal Ry. Co., 203 S.W.2d 606, 609 (Mo. 1947) ("Overhead . . . includes the continuous expense of a business irrespective of the direct costs on particular contracts."); Neumiller Farms, Inc. v. Cornett, 368 So. 2d 272, 276-77 (Ala. 1979).

5

eliminating that amount of profit from the revenues, Martin concluded that the resulting figure represented both direct and indirect costs. Martin testified that overhead costs represented approximately eight percent of the total cost of the New Market project. The record does not reveal Martin's methodology for arriving at the eight percent figure.

Martin testified that this method of computing overhead costs has been accepted by Medicare in the past. In addition, he testified that DMAS accepted this methodology when used by Total Designs, the company that provided furnishings and decorations to New Market for the same project.

Glen Walker, a certified public accountant licensed in Virginia, testified as New Market's expert witness that Martin's overhead figure of eight percent was unusually low. He indicated that ten percent is a more typical overhead amount on commercial construction projects. Walker also testified that the technique Martin used to calculate overhead expenses has been used in Virginia in the Medicaid program and is generally used 90% of the time.

In the second calculation, Martin determined the total amount of overhead costs billed by Life Care Construction for all of its projects that year. Martin then "took the percentage of . . . New Market's overhead billings to the total overhead billings for those two years and applied that percentage to the total [actual] overhead costs to identify . . . approximately

6

$79,000 of overhead that should be allocated to . . . New Market."  That amount "actually exceed[ed] the billings that . . . Life Care Construction made to . . . New Market."  Martin testified that this method "had been used for Medicare and . . . Medicaid [in other] states and was a rather commonly accepted method of determining the related party costs."  However, he added that he had "never had to do this type of [calculation] for another DMAS audit" because New Market was Life Care Centers of America's only facility in Virginia.  Walker, the certified public accountant, testified that methods similar to this second analysis are used ten percent of the time.

Martin testified that he had offered to provide "back-up documentation" to support his calculations.  However, James Branham, the audit supervisor for DMAS, testified that Life Care Construction's documents were not made available to him for review during the audit.  He said that he had only received "some compiled financial statements."  Branham also testified, however, that an analysis that is based upon revenues is "not an acceptable basis of allocating costs."  He stated that such an analysis is inappropriate in related party cases because the revenue is not determined in an arms length transaction.  Branham further testified that although Martin had initially agreed to work with him to "develop this cost information" in a manner that was "more in accordance with the Medicare and Medicaid regulations," Martin did not contact him.

7

Wendall Gatlin, a senior officer for DMAS, testified that he sought the additional documentation because he "wanted to determine what services [New Market] received" from Life Care Construction. He was concerned that there was a "duplication of duties" between Life Care Construction and Thompson, the local contractor.

On the issue of DMAS's denial of reimbursement for a portion of the interest expense incurred in financing the construction loan, Martin testified that New Market borrowed $1,200,000 to finance the project and that the actual total cost of the project was $1,075,474. Because the loan exceeded the actual cost, New Market only sought reimbursement of the interest expense for the portion of the loan that actually was needed, the $1,075,474 total cost of the project.

Martin testified that DMAS initially disallowed $104,461 of the total costs and that a large portion of that amount was the overhead cost disallowance. To avoid reimbursing the interest on the portion of the loan attributable to an expense DMAS disallowed, the total amount of the loan was adjusted to $971,013 for interest reimbursement purposes. The amount was adjusted again to account for a portion of management fees that exceeded amounts allowable under the Medicare regulations. DMAS determined that the money used to pay the management fees "was cash that the facility could have withheld and not paid to the management company and used to fund the construction rather than

paying it to the management company."  In addition, DMAS determined that partnership distributions and loans had been made in the amount of $263,266.  DMAS determined that New Market should have used those funds to reduce its need to borrow. Finally, the amount of the loan was also adjusted to account for expenditures of operating funds made during the construction process.  DMAS determined that because only $573,923 of the total loan was necessary for the project, interest attributable only to that portion of the loan would be reimbursed.

Based on this evidence, the hearing officer reversed the decision to deny the reimbursements and ruled in favor of New Market.  DMAS then appealed.  After review by DMAS's Director, DMAS issued a final agency decision that rejected the hearing officer's conclusions of law and denied the reimbursements New Market sought.  On appeal to the circuit court, the trial judge affirmed DMAS's ruling as contained in the final agency decision. New Market now appeals.

II.

STANDARD OF REVIEW

Recently, this Court specifically addressed the standard of review applicable to similar cases.

> In reviewing decisions by DMAS, an appellate court accords great deference to both the agency's factual findings and interpretation of the laws applicable to "the reimbursement due qualified providers for their reasonable cost incurred while delivering health care services."  This Court will overturn DMAS' "interpretations of the statutes and regulations governing Medicaid

9

and Medicare principles of reimbursement
. . . only . . . when found to be arbitrary
and capricious."

Beverly Health and Rehab. Servs., Inc. v. Metcalf, 24 Va. App.

584, 592, 484 S.E.2d 156, 160 (1997) (citations omitted).

### III.

### CONSTRUCTION COSTS

New Market first argues that the trial judge erred in

affirming DMAS's decision to deny reimbursement of certain

construction costs.  New Market contends that DMAS erroneously

arrived at its decision without first reviewing New Market's

supporting documentation.  DMAS argues that New Market failed to

provide adequate supporting documentation and that, therefore,

the denial of reimbursement was supported by 12 VAC 30-90-110

(1990).  DMAS also argues that New Market's methodology for

isolating the overhead costs applicable to the New Market project

was inadequate.

> The trial judge made the following rulings:
> It was New Market's responsibility to
> furnish evidence in support of its claim for
> reimbursement for management fees and
> overhead costs. . . .  DMAS insisted that New
> Market furnish information on a cost and not
> a revenue basis.  After the Informal Fact
> Finding Conference, there was a general
> agreement that the parties would meet for the
> purpose of developing procedures for
> providing cost information and the supporting
> data for such costs.  The time for
> accomplishing this was extended by DMAS, and
> New Market's response has been to insist on
> reimbursement on a revenue basis.

The evidence supports that ruling.

10

To facilitate the process of auditing health care providers, DMAS requires providers to keep and make accessible adequate documentation to support their claims for reimbursement. See 12 VAC 30-90-110 (1990). In relevant part, 12 VAC 30-90-110 provides as follows:

> II. Types of records to be maintained. Information which must be maintained for the duration of the provider's participation in the DMAS includes, but is not limited to:
>
>     \*     \*     \*     \*     \*     \*     \*
>
>     D. Copies of all <u>cost reports</u> filed with the DMAS together with <u>supporting financial statements</u>.
>
> III. Record Availability. The records must be available for audits by DMAS staff. Where such records are not available, costs shall be disallowed.

(Emphasis added). As pertinent to this case, DMAS would have grounds to deny New Market's claim if New Market failed to make available its cost reports or supporting financial statements. See 12 VAC 30-90-110 (II)(D).

The evidence reveals that DMAS sought to audit the financial documents that would support New Market's request for reimbursement. Branham, the audit supervisor for DMAS who oversaw the audit of New Market, testified that "[w]hen [they] requested [the documentation], what was furnished were some financial statements." Branham stated that he sought more detailed information than the "compiled financial statements" provided by New Market; he sought documents demonstrating "the

11

various components of [the] . . . costs and the revenue."
Gatlin, a senior officer for DMAS, testified that the auditors
"were after the detail of the services" that Life Care
Construction provided to New Market. Gatlin stated that DMAS
initially "wanted to determine what services . . . [New Market]
received" from Life Care Construction.

Branham testified that when New Market initially sought
reimbursement for money paid to Life Care Construction, DMAS
"questioned the need" for the payment "because they had a general
contractor, . . . Thompson, who was on-site and was doing . . . a
lot of the subcontracting." DMAS also questioned "the
methodology" that New Market used. New Market had only submitted
a "profit computation" as justification for the fees charged by
Life Care Construction. DMAS informed New Market that it
required additional financial documents because New Market had
merely submitted statements using a "revenue basis" for
calculating the payment it made to Life Care Construction.
Branham testified that the Medicaid regulations require that
providers be reimbursed only for actual costs incurred by related
parties. He testified that revenue based methodologies are not
acceptable because related party transactions are "not . . .
arms-length transaction[s]" and, thus, "revenue[s] can be set at
whatever the related parties agree." Branham testified that when
the DMAS auditors requested supporting financial statements for
the requested reimbursement they only received "compiled

12

financial statements" that did not provide adequate "back-up" financial documentation to support New Market's methodology.

Branham further testified that at the informal conference DMAS informed New Market "that the more appropriate method would be to identify all of the various project costs and use that basis for allocating the indirect costs or the overhead components."  Although DMAS believed that it had reached an agreement with New Market to develop the cost information, New Market did not follow through.  Instead, it submitted another revenue based proposal.  New Market also did not submit financial documentation to support the second proposal.

Accordingly, we hold that the evidence supports the trial judge's finding that New Market failed to meet its burden, under 12 VAC 30-90-110, to provide documentary evidence to support its claim for reimbursement.  "Because the trial [judge's] decision upholding DMAS's denial of payment to [New Market] is consistent with Medicare principles of reimbursement, [the] decision was not arbitrary or capricious and must be affirmed."  Fralin, 18 Va. App. at 705, 447 S.E.2d at 243.

IV.

INTEREST EXPENSE

New Market sought reimbursement for interest expenses it incurred to finance the construction loan.  DMAS found that portions of the loan were unnecessary and denied reimbursement for the interest that accrued on those portions of the loan.

13

Under the Nursing Home Payment System, "cost shall include actual allowable . . . interest."  NHPS § 2.1 (A) (1989-1991). All costs, including interest, must be necessary and reasonable. See NHPS App. I, § 1.1 (A) (1989-1991).  As the NHPS does not define "necessary" and "reasonable," we must look to the Medicare principles of reimbursement as set forth in the Provider Reimbursement Manual for guidance.  See Beverly, 24 Va. App. at 594, 484 S.E.2d at 161.  "Necessary and proper interest on both current and capital indebtedness is an allowable cost."  Prov. Reimb. Man., Part 1, § 200 (1968).  "To be allowable under the Medicare program, interest must be . . . necessary and proper for the operation, maintenance, or acquisition of the provider's facilities."  Prov. Reimb. Man., Part 1, § 202.1 (1968). "Necessary means that the interest [must] be incurred on a loan made to satisfy a financial need of the provider . . . ."  Prov. Reimb. Man., Part 1, § 202.2 (1983).[2]

Interest Incurred to Pay Management Fees

The record reveals that DMAS reduced the amount of the loan for which it would pay the interest expense in part to account for management expenses New Market incurred.  No authority supports that reduction.  DMAS made the adjustment on the ground that because related party management fees are not reimbursable, the management fees should not have been incurred; rather, New

_____

[2]§ 202.2 has been amended since 1983; however, the 1983 version is applicable to the cost reports for 1989, 1990, and 1991 involved in this case.

14

Market should have used those funds to reduce its need to borrow.

DMAS misapplies the law. To determine whether interest for a loan is reimbursable, the relevant inquiry is the necessity for the loan. See Prov. Reimb. Man., Part 1, § 202.1 (1968). Whether DMAS will reimburse a given expenditure is a different question than whether an expenditure is necessary. DMAS does not reimburse all expenditures made by providers that are necessary for the ongoing operation of their facilities. Thus, regardless of whether DMAS would reimburse New Market for related party management fees, the interest on the loan is reimbursable so long as the management fees were a necessary expense incurred in operating New Market's health care facility.

At the evidentiary hearing, Martin described the management services as "accounting services, data processing services, risk management services, [and] . . . general overall supervision." No evidence was offered at the hearing that would tend to show that the management services were not a necessary expense of the health care facility. Accordingly, we hold that the trial judge erred in affirming DMAS's decision to deny reimbursement for interest on the portion of the loan that was equivalent to the amount of management fees paid by New Market.

Partnership Distributions

DMAS determined that the amount of the loan necessary for New Market's project should be reduced by $263,266, the amount of the partnership distributions made between 1987 and 1989. DMAS

15

reasoned that New Market had those funds available and could have used them to reduce its need to borrow. Thus, DMAS found that $263,266 of the loan was not "necessary."

New Market argues that under Pioneer Hosp. v. The Travelers Ins. Co., 1983-1 Medicare & Medicaid Guide, New Developments (CCH) Para. 32,400 (PRRB Jan. 7, 1983), DMAS's consideration of the partnership distributions was erroneous. We agree. In Pioneer, the Provider Reimbursement Review Board held that when determining whether a loan was "necessary" for interest reimbursement purposes, the availability of funds and distributions to partners after the loan was made are not relevant. Rather, a reviewing tribunal should only consider the provider's financial condition as it existed at the time the loan was made. Therefore, we hold that DMAS erred in using the partnership distributions made after the loan commitment as a basis for reducing the amount of interest it would reimburse.

Accordingly, we affirm the trial judge's decision to uphold DMAS's denial of reimbursement for the related party overhead expenses. However, we reverse the remainder of the decision and remand the case to the trial judge. The trial judge shall remand the case to DMAS to remove the interest deductions it imposed on account of the management fees and partnership distributions.

Affirmed in part, reversed in part, and remanded.

16