COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judge Benton and
           Senior Judge Duff
Argued at Alexandria, Virginia


HOLTZMAN OIL CORP.
                                              OPINION BY
v.    Record No. 0422-99-4    CHIEF JUDGE JOHANNA L. FITZPATRICK
                                              JUNE 6, 2000
COMMONWEALTH OF VIRGINIA,
 STATE WATER CONTROL BOARD AND
 DEPARTMENT OF ENVIRONMENTAL QUALITY


            FROM THE CIRCUIT COURT OF SHENANDOAH COUNTY
                       Dennis L. Hupp, Judge

            Thomas A. Schultz, Jr., for appellant.

            John R. Butcher, Assistant Attorney General
            (Mark L. Earley, Attorney General, on brief),
            for appellee.


     Holtzman Oil Corp. (Holtzman) appeals a final circuit court

judgment upholding a decision by the Commonwealth's Department

of Environmental Quality (DEQ) denying reimbursement from the

Petroleum Storage Tank Fund (Tank Fund).[1]  After the DEQ denied

its request, Holtzman appealed pursuant to the Virginia

Administrative Process Act (VAPA), Code §§ 9-6.14:1 through

9-6.14:25.  The circuit court ruled that the agency's decision

---

    [1] Code §§ 62.1-44.34:10 through 62.1-44.34:13 govern the
establishment and administration of the Tank Fund under the
direction of the State Water Control Board (Board).  DEQ is
empowered to implement regulations of the Board and administer
funds appropriated to it.  See Code §§ 10.1-1182 through
10.1-1187.

was not "arbitrary or capricious resulting in a clear abuse of discretion."  The sole issue raised on appeal is whether the evidence supports the circuit court's order affirming the DEQ's decision denying reimbursement from the Tank Fund.  For the following reasons, we affirm.

## I.  BACKGROUND

The evidence established that on November 5, 1993, Holtzman notified the DEQ of its intent to remove certain underground storage tanks from a gas station in Harrisonburg, Virginia.  In December 1993, the tanks were replaced.  During the tank removal process, Holtzman discovered "mildly contaminated soils but saw no evidence of a leaking tank or line during any part of the excavation."  Upon further investigation, the company learned that "the product lines had been replaced in the early 1980's due to leaks."  Approximately 2,900 tons of soil were excavated from the Harrisonburg site and laboratory analysis of the "backfill material in the basins" showed the petroleum hydrocarbon level in the soil was 160 parts per million.  Holtzman notified the DEQ of these findings on December 8, 1993.

On December 15, 1993, the DEQ informed Holtzman that, in accordance with applicable regulations, it was required to perform a "Release Investigation Report" upon a finding of contaminated soils.  That report, submitted by the company on January 31, 1994, disclosed that nine underground tanks had been removed from the site, no holes were found in any of the tanks,

and samples of the soils alongside and beneath the tanks showed petroleum hydrocarbon levels ranging from 24 to 57 parts per million. A sample of "backfill material" from around the diesel tank showed petroleum hydrocarbon in the soil of 160 parts per million and samples of "backfill material" from the main excavation showed 129 and 42 parts per million. In February 1994, without prior notice to the DEQ, Holtzman incinerated the 2,900 tons of contaminated soil at a total cost of $140,705.

Based on the Release Investigation Report and addendum information, the Valley Regional Office of the DEQ found no "significant release" and that "the risk in the urban setting would be extremely low." The regional office recommended "that the case should be closed." In its letter dated October 20, 1994, the DEQ notified Holtzman that it was closing its investigation and that no further "corrective action" would be required unless "significant environmental or health/safety problems develop in this area."

Pursuant to Code § 62.1-44.34:11, Holtzman made a formal request on March 22, 1995 for reimbursement from the Tank Fund for the clean-up costs. Holtzman alleged that the removal of the contaminated soil constituted an "abatement activity" within the meaning of Virginia Regulation 680-13-02 § 6.3(A)(4) and, based on its interpretation of the applicable regulations, the clean-up costs were reimbursable.

On July 18, 1995, the DEQ denied Holtzman's request for reimbursement. In a letter dated October 11, 1995, the DEQ explained its reasons for denying the claim, stating:

> [R]eview of the file indicates that the denials stem from the excavation of soils without approval by the Regional Office.
>
> \*　　\*　　\*　　\*　　\*　　\*　　\*
>
> . . . [T]he Agency is required by law to determine whether the activities submitted for reimbursement were approved or would have been approved had they been timely presented to the Agency for consideration.
>
> Valley Regional Office (VRO) files indicate that your client failed to contact VRO staff to determine whether soil removal would be approved. Moreover, VRO files indicate that the removal would not have been approved had your client timely requested such consideration. Among other things, (1) even the highest TPH result showed minimal contamination; (2) the site is in a location with public water, meaning there was no threat of a drinking water impact; and (3) there were no basements nearby, meaning there was no threat of a building vapor impact.

(Emphasis added).

Holtzman sought review by the DEQ's Reconsideration Panel (Panel). In its opinion letter dated May 28, 1995, the Panel issued its final decision denying Holtzman's request for reimbursement. The Panel considered the issue before it to be "whether the removal of the soil from the Rolling Hills site was necessary for corrective action." Because Holtzman did not seek prior approval from the DEQ before incinerating the soil and

- 4 -

consistent with the regulations and policy then in effect, the

Panel determined whether the excavation would have been approved

had the DEQ been properly notified.  On reconsideration, the

Panel affirmed the denial of Holtzman's claim, stating the

following:

> Soil excavation and removal may be conducted when implementing a corrective action plan or as part of a Phase II initial abatement.  The regulation and Agency guidance indicate that initial abatement activities do not normally include removal of soil with low levels of contamination, as the focus is instead on abatement of fire, vapor and explosion hazards.
>
> The course of events at your site indicated that the soil was removed as part of site reconstruction and not as part of corrective action.  The fact that the soil already had been excavated before you reported a release establishes that the soil removal was not conducted as an abatement activity.  Equally important, during the meeting you acknowledged that the soil was removed to allow for site reconstruction rather than for environmental considerations (corrective action).
>
> Given the preceding facts, we must conclude that the soil excavation was not a necessary, approvable corrective action activity.  Because the soil excavation was not a necessary corrective action activity, the subsequent disposal activity also was not a necessary corrective action activity. Thus, costs incurred as a result of the soil excavation are not approved for reimbursement.

(Emphasis added).

On July 31, 1996, Holtzman appealed the DEQ's final decision to the circuit court.  The circuit court affirmed the DEQ's decision, stating:

> In reviewing the record, I must afford the agency decision a presumption of official regularity, and I must take into account the experience and specialized competence of the [Board] and DEQ.  I am not to substitute my own judgment for that of the agency.  While I find Holtzman's position quite reasonable in this case, I cannot find that the agency's decision was arbitrary or capricious resulting in a clear abuse of discretion.

The circuit court denied Holtzman's motion for reconsideration, concluding that it could not "substitute [its] judgment" for the "factual determination[s]" by the "agency officials."

## II.  STANDARD OF REVIEW

Judicial review of agency decisions is authorized by the VAPA.  See Code § 9-6.14:17.  Issues of law specified in the statute "fall into two categories:  first, whether the agency . . . acted within the scope of [its] authority, and second, whether the decision itself was supported by the evidence." Johnston-Willis Ltd. v. Kenley, 6 Va. App. 231, 242, 369 S.E.2d 1, 7 (1988).  Although many circumstances involve "mixed questions" of both "law and fact," issues are sometimes "oversimplified" as "legal" or "factual," a distinction that is significant to judicial review of an administrative decision. Id. at 243, 369 S.E.2d at 7.  The separate standards of review

determine the degree of deference, if any, to be given to an

agency's decision on appeal.  See id. at 246, 369 S.E.2d at 9.

> Where the issue is whether there is
> substantial evidence to support findings of
> fact, great deference is to be accorded the
> agency decision.  Where the issue falls
> outside the specialized competence of the
> agency, such as constitutional and statutory
> interpretation issues, little deference is
> required to be accorded the agency decision.
> Where, however, the issue concerns an agency
> decision based on the proper application of
> its expert discretion, the reviewing court
> will not substitute its own independent
> judgment for that of the agency but rather
> will reverse the agency decision only if
> that decision was arbitrary and capricious.
> Finally, in reviewing an agency decision,
> the courts are required to consider the
> experience and specialized competence of the
> agency and the purposes of the basic law
> under which the agency acted.

Id. (emphasis added).

The DEQ, acting in conjunction with the Board, is the

Virginia agency charged with administrating the Tank Fund.  See

Code §§ 62.1-44.34:10 through 62.1-44.34:13; Code §§ 10.1-1182

through 10.1-1187.  The DEQ possesses the requisite experience

and competence necessary to determine levels of contamination

and the reimbursement due "owners and operators" for the

reasonable costs incurred for their environmental clean-up

efforts.  As such, its interpretations of the statutes and

regulations governing the Tank Fund's reimbursement policies are

entitled to deference by a reviewing court and should only be

overturned when found to be arbitrary and capricious.  See

Fralin v. Kozlowski, 18 Va. App. 697, 701, 447 S.E.2d 238, 241 (1994).

### III. TANK FUND REIMBURSEMENT

Holtzman argues that it was required under VR 680-13-02 § 6.3 to remove and dispose of the contaminated soil at its Harrisonburg site simply because there was a confirmed release of petroleum in the environment. In seeking reimbursement, Holtzman interprets VR 680-13-02 § 6.3(A)(4) to mean that the costs for any "abatement activity" under this subsection are reimbursable. Applying the plain meaning of the term "abate," Holtzman contends an activity that "reduce[s] or lessen[s]" soil contamination falls within the meaning of the regulations. Because the excavation in the instant case resulted in a reduction or lessening of the petroleum hydrocarbon levels in the soil, Holtzman concludes that the clean-up efforts were reimbursable. We hold that the trial judge did not err in affirming the DEQ's decision.

The Tank Fund was established to reimburse "reasonable and necessary" costs incurred by "owners and operators" of underground petroleum storage tanks "in taking corrective action for any release of petroleum into the environment . . . ." Code § 62.1-44.34:11(A)(2)(a). A "release" means "any spilling, leaking, emitting, discharging, escaping, leaching, or disposing from an underground storage tank or facility into . . . subsurface soils . . . ." Code § 62.1-44.34:10. The

regulations provide for reimbursement in, among others, the following two instances:  (1) where there is "corrective action necessary to protect human health and the environment," VR 680-13-03 § 21(A)(1) (emphasis added); or (2) where the owner or operator conducts a "board approved corrective action plan." VR 680-13-03 § 21(A)(2) (emphasis added).

Because Holtzman's activities were not conducted pursuant to a "board approved corrective action plan," the sole issue before us is whether the excavation of the contaminated soil constituted "corrective action necessary to protect human health and the environment."  In making this determination, we note that effective March 1, 1995, DEQ policy required that "corrective action activities be authorized by the appropriate Regional Office in order to be eligible for reimbursement." However, consistent with the regulations and policy in effect at the time of the instant case, reimbursement for "corrective action" activities would be proper if Holtzman's activities "were approved or would have been approved had they been timely presented to the Agency for consideration."  (Emphasis added).

The DEQ's denial of reimbursement costs from the Tank Fund was consistent with the applicable regulations, was supported by the evidence in the record, and was not arbitrary and capricious.  The DEQ concluded that "the soil excavation itself was not a necessary corrective action activity" and that "the

subsequent disposal activity also was not a necessary corrective action activity."  The phrase "corrective action" means

> all actions necessary to abate, contain and cleanup a release from an underground storage tank, to mitigate the public health or environmental threat from such releases and to rehabilitate state waters in accordance with [Sections 5 and 6] of VR 680-13-02 . . . . The term does not include those actions normally associated with closure or change in service as set out in [Section 7] of VR 680-13-02 or the replacement of an underground storage tank.

VR 680-13-03 § 1.  Thus, any one of the activities enumerated in Sections 5 and 6 of VR 680-13-02 may constitute "corrective action," including the following:  "[r]elease investigation and confirmation steps"; "[r]eporting and cleanup of spills and overfills"; and "site characterization."
VR 680-13-02 §§ 5.3, 5.4, 6.4.

As applied in the instant case, the term "corrective action" also includes those activities conducted as "initial response" measures under Section 6.2 or "initial abatement measures" under Section 6.3.  See VR 680-13-02 §§ 6.2, 6.3.  The clear language of Section 6.2 requires that upon a confirmed release of petroleum, owners and operators must:  (1) report the release to the Board within twenty-four hours; (2) take immediate actions to prevent further release; and (3) identify and mitigate fire, explosion, and vapor hazards.  See VR 680-13-02 § 6.2.  The DEQ has interpreted VR 680-13-02 § 6.2 to include those activities involving "hazards" to "human

health, safety and the environment," which "must be initiated immediately."  As applied to the instant case, Holtzman may not recover its costs for clean-up as an "initial response" activity under Section 6.2 because that regulation addresses those activities used to "mitigate fire, explosion, and vapor hazards," none of which was present here.  Indeed, in its final decision, the DEQ concluded that "[t]he regulations and Agency guidelines indicate that initial abatement activities do not normally include removal of soil with low levels of contamination, as the focus is instead on abatement of fire, vapor and explosion hazards."  Because Holtzman's activities were not performed as an "initial response" activity, reimbursement would not have been proper under VR 680-13-02 § 6.2.

Holtzman contends that it conducted an "initial abatement measure" under VR 680-13-02 § 6.3.  The DEQ's April 29, 1992 "Guidance Memorandum" characterizes the following activities as appropriate "Phase I Initial Abatement Measures":

> [A]ll those activities which for human health, safety and the environment must be initiated immediately.  Examples of these activities include emptying the tank, free product removal, mitigation of vapor hazards and excavation/proper disposal of saturated soils immediately surrounding an [underground storage tank] being removed.

(Emphasis added).  These initial abatement measures "may be undertaken without Regional Office approval," and the DEQ will

"require [the party] to justify any questionable Initial Abatement Measures" before it will reimburse those expenses. (Emphasis added).

Although Holtzman did not seek prior approval in this case, the DEQ concedes that costs may be recovered under Section 6.3 if the "initial abatement measures" would have been approved had the company timely notified the DEQ of its actions. Here, Holtzman contends that any "abatement activity" that reduces or lessens contamination levels in the soil is reimbursable.

In response, the DEQ argues there were no "hazards" to remedy and, therefore, the initial abatement measure would not have been approved. Additionally, the DEQ contends that excavation of the contaminated soil was performed in the process of replacing the tank system, as opposed to the "result of release confirmation, site investigation, abatement, or corrective action activities." VR 680-13-02 § 6.3(A)(4). Thus, the DEQ concludes, the circuit court properly affirmed the DEQ's denial for reimbursement under Section 6.3 of the regulations.

Contrary to Holtzman's argument, the regulations do not provide a catch-all reimbursement provision for any "abatement activity." Rather, VR 680-13-02 § 6.3 provides in pertinent part as follows:

> A. Unless directed to do otherwise by the board, owners and operators must perform the following abatement measures:
>
>  *     *     *     *     *     *     *

- 12 -

> 4. <u>Remedy hazards posed by contaminated soils</u> that are excavated or exposed as a result of release confirmation, site investigation, <u>abatement</u>, or corrective action activities. If these remedies include treatment or disposal of soils, the owner and operator must comply with applicable state and local requirements[.]

(Emphasis added). By express terms of the regulation, to qualify for reimbursement under this section, Holtzman was required to show: (1) the existence of "hazards posed by contaminated soils," and (2) the hazard was the result of an "abatement, or corrective action activit[y]." VR 680-13-02 § 6.3(A)(4).

Holtzman failed to establish the first prong of this test. As noted in the initial Regional Investigation Report, Holtzman reported that it discovered "<u>mildly contaminated soils</u> but saw <u>no evidence of a leaking tank or line</u> during any part of the excavation." (Emphasis added). Upon further investigation, Holtzman learned that "the product lines had been replaced in the early 1980's due to leaks." According to DEQ records, Holtzman reported "that there were some 'hot spots' around some of the old pipelines but that the basin soils were okay." The DEQ agreed, stating that there was an "insignificant release" and that the soil "could have been used as 'clean fill.'" Accordingly, the DEQ closed its investigation of the site on October 20, 1994 and concluded "further corrective action is not required at this time."

Without prior notification to the Board, Holtzman incinerated the 2,900 tons of contaminated soil. In a letter explaining its denial for reimbursement, the DEQ concluded that the removal would not have been approved as "corrective action" because there was "minimal contamination," "no threat of drinking water impact," and "no threat of a building vapor impact." On review by the Panel, the DEQ further concluded that "initial abatement activities do not normally include removal of soil with low levels of contamination, as the focus is instead on abatement of fire, vapor and explosion hazards." The record supports the finding that Holtzman did not prove the level of contamination was substantial enough to require an excavation of soil so as to fall within the parameters of an initial abatement measure.

We accord great deference to an administrative agency's interpretation of the regulations it is responsible for enforcing. See Hilliards v. Jackson, 28 Va. App. 475, 479, 506 S.E.2d 547, 550 (1998); Arellano v. Pam E. K's Donuts Shop, 26 Va. App. 478, 483, 495 S.E.2d 519, 521 (1998). The term "hazard" has been defined as "a thing or condition that might operate against success or safety . . . a possible source of peril, danger, duress or difficulty." Webster's Third New International Dictionary 1041 (1993).

In the present case, Holtzman presented no evidence regarding an abatement of "fire, explosion, and vapor hazards"

or the presence of high levels of contamination.  Moreover, the record supports the following findings made by the DEQ:

> [The] site is in an urban area with public water, no basements and a relatively deep water table.  In addition, none of the test results showed significant contamination, including the test results from the excavated soil piles.  Thus, the evidence supports the conclusion that this was a low risk site with minimal contamination in a limited area.

>    *      *      *      *      *      *      *

> The course of events at your site indicated that the soil was removed as part of site reconstruction and not as part of corrective action.  The fact that the soil already had been excavated before you reported a release establishes that the soil removal was not conducted as an abatement activity.  Equally important, during the meeting you acknowledged that the soil was removed to allow for site reconstruction rather than for environmental considerations (corrective action).

The DEQ concluded that Holtzman's actions were not necessary to "remedy hazards posed by contaminated soils," and like the circuit court, we will not substitute our own independent judgment for the factual determinations of the DEQ. Because the DEQ's decision was not arbitrary and capricious, we affirm.

<u>Affirmed.</u>