# CIRCUIT COURT OF THE CITY OF SUFFOLK

Dogwood Realty, Inc.

v.

Virginia Department
of Social Services
and Clarence H. Carter,
Commissioner

September 1, 2000

Case No CL00-84

BY JUDGE D. ARTHUR KELSEY

Dogwood Realty, Inc., operates an adult-care facility known as the Suffolk Retirement Center licensed and regulated by the Virginia Department of Social Services. The Department conducted an investigation of the Suffolk Retirement Center and cited it for violating administrative regulations prohibiting licensed facilities from changing or discontinuing medications administered to residents. Seeking to overturn the agency decision and to vacate any civil penalties, the Suffolk Retirement Center claims the Department both misinterpreted its own regulations and misapplied them to the facts of this case. For the following reasons, the Court disagrees.

The administrative record reveals that the Department began investigating the Suffolk Retirement Center ("SRC") in 1999. An inspector from the Division of Licensing Programs conducted an audit into the handling of prescription medications at the facility. A random selection of residents' medical records demonstrated that "three residents were out of medications and needed a reorder and an appointment with their doctor to have the

prescriptions renewed." Adm. Record at 57. "As of June 8, only one had an appointment to see a doctor, and that was a week later." *Id.* "There was no apparent means in place to anticipate the expiration of the prescriptions by scheduling appointments or locating resources to help defray the costs of seeing the doctors." *Id.*; *see also id.* at 74.

Later, on August 9, 1999, "a resident was brought to the hospital emergency room (ER) after Suffolk Police officers found him in the middle of a major highway, U.S. 460, having a seizure." *Id.* at 57; *see also id.* at 66. "At the ER he was found to have below effective levels of Dilantin in his blood." *Id.* at 57. Records at SRC "showed he had not received Dilantin," an anti-seizure medication, on "several days in July and in August because he was not in the building when medication was given." *Id.*; *see also id.* at 59. SRC records "did not indicate efforts to give him his medication when he returned, or to change the administration schedule to a time when he was more likely to be present." *Id.* at 57. SRC's improper administration of Dilantin, the Department concluded, was causally related to the resident's seizure. *Id.* at 59.

Based upon these factual findings, the Department concluded that SRC violated an administrative regulation that stated: "No medication . . . shall be started, changed or discontinued by the facility without an order by the physician." 22 VAC 40-71-400(A). This regulation comes from the Department's "Standards and Regulations for Licensed Adult Care Residences" at Part IV, section 400(A), entitled "Resident Accommodations, Care and Related Services." The violations, the Department believed, were "serious" and the "potential impact of this situation could involve significant risk to all residents for whom the home takes the responsibility for administering medication." Adm. Record at 57. "Failure to maintain compliance with standards in the future," the Department warned SRC, "could place your license in jeopardy." *Id.* at 57.

When the Department brought these matters to SRC's attention, the President and owner of SRC, Dr. Nazir Chaudhary, requested an informal conference to present his position. He brought with him SRC's Director of Operations, the Medical Technician, the Administrator, and an employee nurse. *Id.* at 6. At the conference, Dr. Chaudhary asserted that a legitimate explanation could be made for each of the incidents. With respect to the three resident files found during the random audit, he argued that the first patient had his medication originally filled by a Veterans' Administration ("VA") hospital and the patient had no local private physician. *Id.* at 7. After receiving the original violation letter, SRC staff contacted the local VA hospital, which, in turn, lined the patient up with a local physician. *Id.* The second patient had his medication discontinued by his doctor *before* the investigation, Dr.

Chaudhary pointed out. *Id.* And the third patient had his medication discontinued by his physician at some point *after* the investigation. *Id.*

Concerning the resident found on Route 460 having a seizure, Dr. Chaudhary asserted that this resident was an alcoholic and was not receiving a sufficiently high "therapeutic dose" of Dilantin. *Id.* at 6. Moreover, the patient would both wander off from the facility and, even when present, would sometimes refuse his medications when SRC staff offered them to him. *Id.* The staff could not give the medications "more than an hour" after the designated time, Dr. Chaudhary believed, without violating another regulation. Nor could the staff force him to take the medications against his will, Dr. Chaudhary argued. *Id.* Finally, Dr. Chaudhary contended that the resident's "alcohol abuse," not any problem with the administration of medication, caused the seizure. *Id.*

The Department accepted none of Dr. Chaudhary's arguments, except the explanation given for the second randomly selected patient who had his medication discontinued by his physician before the inspection. *Id.* at 7. As to that incident, the Department explained, it had already been dismissed by the investigator prior to recommending the proposed penalty. *Id.* ("The second resident addressed was not one for whose records a violation had been cited.").

The Commissioner for the Department of Social Services issued a final "Special Order" holding SRC in violation of agency regulations and assessing a civil penalty against the facility. The Commissioner predicated his decision on two separate violations: (i) the random audit discovered two patients with unfilled medical orders at the time of the inspection, and (ii) the Dilantin patient found on Route 460 had not received his anti-seizure medication pursuant to his doctor's orders. *Id.* at 4. Dissatisfied with the Commissioner's decision, SRC filed this action seeking judicial review under the Virginia Administrative Process Act ("VAPA"), Va. Code Ann. § 9-6.14:1, *et seq.* (Michie 1998 & Supp. 2000). The Commissioner's "Special Order" qualifies as an appealable "case decision" under the VAPA. *See* Va. Code Ann. § 63.1-179.1 (Michie Supp. 2000).

In an appeal under the VAPA, the burden of proof must be shouldered by the party challenging the agency action. *See Johnston-Willis, Ltd. v. Kenley*, 6 Va. App. 231, 241, 369 S.E.2d 1, 6 (1988). The legal challenge also must be routed through an appellate matrix, rather than the *de novo* standard typically employed by trial courts. Thus, a "circuit court's role in an appeal from an agency decision is equivalent to an appellate court's role in an appeal from a trial court." *York County Sch. Bd. v. Nicely*, 12 Va. App. 1051, 1062, 408 S.E.2d 545, 551 (1991). In this sense, "the General Assembly has

provided that a circuit court acts as an appellate tribunal." *J. P. v. Carter*, 24 Va. App. 707, 721, 485 S.E.2d 162, 169 (1997) (citation omitted); *see also Pence Holdings, Inc. v. Auto Center, Inc.*, 19 Va. App. 703, 707-08, 454 S.E.2d 732, 734 (1995).

All factual issues on appeal are "controlled solely by the agency record," and thus, the "reviewing court is not free to take additional evidence, even at the request of one of the parties." *York County Sch. Bd.*, 12 Va. App. at 1062 and n. 2, 408 S.E.2d at 551 and n. 2 (VAPA permits the circuit court to accept evidence in rare circumstances, not applicable here, "where no agency record exists"). The VAPA limits judicial review of factual issues to determining whether "substantial evidence in the agency record" exists upon which "the agency as the trier of the facts could reasonably find them to be as it did." Va. Code Ann. § 9-6.14:17. Substantial evidence is "such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion." *Virginia Real Estate Comm'n v. Bias*, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983) (emphasis in original) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Under the substantial-evidence standard, the court may reject an agency's findings of fact "if, considering the record as a whole, a reasonable mind would necessarily come to a different conclusion." *Johnston-Willis, Ltd.*, 6 Va. App. at 242, 369 S.E.2d at 7. This standard is "designed to give great stability and finality to the fact-findings of an administrative agency." *Johnson v. Virginia Retirement System*, 30 Va. App. 104, 109-110, 515 S.E.2d 784, 787 (1999) (citation omitted); *Smith v. Dept. of Mines, Minerals & Energy*, 28 Va. App. 677, 685, 508 S.E.2d 342, 346 (1998) (citation omitted). The reviewing court, therefore, may not "merely substitute its own independent judgment for that of the body entrusted by the Legislature with the administrative function." *Turner v. Jackson*, 14 Va. App. 423, 430-31, 417 S.E.2d 881, 887 (1992) (citations omitted).

A different set of principles governs the review of legal interpretations made by administrative agencies. A legal issue involving "statutory interpretation" comes within the "specialized competence" of the courts rather than administrative agencies. *Johnston-Willis*, 6 Va. App. at 247, 369 S.E.2d at 10. When a violation of the agency's statutory authority has been alleged, "reviewing courts should not abdicate their judicial function and merely rubber-stamp an agency determination." *Johnston-Willis*, 6 Va. App. at 243, 369 S.E.2d at 7-8. Settled law requires "little deference" to an agency's interpretation of statutes. *Johnston-Willis, Ltd.*, 6 Va. App. at 246, 369 S.E.2d at 9.

On the other hand, courts give "great deference" to an agency's interpretation of its own regulations. *See Holtzman Oil Corp. v. Commonwealth*, 32 Va. App. 532, 539, 529 S.E.2d 333, 337 (2000). *See also Hilliards v. Jackson*, 28 Va. App. 475, 479, 506 S.E.2d 547, 550 (1998); *Carter v. Gordon*, 28 Va. App. 133, 142-43, 502 S.E.2d 697, 701 (1998); *Arellano v. Pam E. K's Donuts Shop*, 26 Va. App. 478, 483, 495 S.E.2d 519, 521 (1998); *Beverly Health & Rehabilitation v. Metcalf*, 24 Va. App. 584, 592, 484 S.E.2d 156, 160 (1997); *Thomas v. Nordstrom Pentagon City*, 22 Va. App. 626, 630-31, 472 S.E.2d 288, 290 (1996). These interpretative decisions can be rejected only if the court finds them "arbitrary and capricious." *Holtzman Oil Corp.*, 32 Va. App. at 539, 529 S.E.2d at 337. This deference stems from Va. Code Ann. § 9-6.14:17, which requires that reviewing courts "take due account" of the "experience and specialized competence of the agency" promulgating the regulation. *Virginia Real Estate Bd. v. Clay*, 9 Va. App. 152, 160-61, 384 S.E.2d 622, 627 (1989) (citation omitted), *appeal dismissed*, 398 S.E.2d 78 (Va. 1990). *See also General Trucking Corp. v. Dishner*, 21 Va. App. 409, 413-14, 464 S.E.2d 545, 547-48 (1995); *Fralin v. Kozlowski*, 18 Va. App. 697, 701, 447 S.E.2d 238, 241 (1994); *Jackson v. W.*, 14 Va. App. 391, 400-01, 419 S.E.2d 385, 390 (1992); *Specialty Auto Body v. Cook*, 14 Va. App. 327, 330, 416 S.E.2d 233, 235 (1992); *Watford v. Colonial Williamsburg Found.*, 13 Va. App. 501, 504, 413 S.E.2d 69, 71 (1992).

In this case, the Virginia Department of Social Services regulates the "Licensing of Homes for Aged, Infirm or Disabled Adults" pursuant to Virginia Code Ann. § 63.1-172 (Michie 1995 & Supp. 2000). These homes provide "maintenance and care" to "aged, infirm or disabled" residents. *Id.* In this context, the duty of "maintenance and care" means the "protection, general supervision and oversight of the physical and mental well-being of the aged, infirm or disabled individual." *Id.*; *see also* 22 VAC § 40-71-10 (definition of supervision and oversight duty).

The statute authorizes the agency to "promulgate and enforce regulations" to (i) carry out the provisions of the statute, (ii) "protect the health, safety, welfare and individual rights of residents" of the licensed facilities, and (iii) "promote their highest level of functioning." Va. Code Ann. § 63.1-174(A) (Michie Supp. 2000). The regulations "shall include standards" for various aspects of the operation of the licensed facility, including the "administration of medicine" to residents. Va. Code Ann. § 63.1-174(B) (Michie Supp. 2000). The statute also grants the agency broad powers to:

promulgate regulations for the Commissioner to use in determining when the imposition of administrative sanctions . . . is appropriate in order to ensure prompt correction of violations involving noncompliance with state law or regulation as discovered through any inspection or investigation . . . .

Va. Code Ann. § 63.1-179.1 (Michie Supp. 2000).

Pursuant to this authorization, the agency promulgated regulations governing those aspects of the licensee's operations covered by the statutory directives. *See* 22 VAC § 40-71-10 *et seq.*[1] Section 40-71-400 addresses standards for the "[a]dminstration of medications and related services." Subsection D(4) states that all "medications shall be administered in accordance with the physician's instructions." To "[a]dminister medication," under the regulations, "means to open a container of medicine or to remove the prescribed dosage and to give it to the resident for whom it is prescribed." 22 VAC § 40-71-10.

Subsection (A) of § 40-71-400 provides that no medication shall be "started, changed or discontinued by the facility without an order by the physician." Medications must be handled exclusively by the facility unless the patient "is capable of self-administering medication." *Id.* at § 40-71-400(C). Staff personnel must be specially trained "to administer medications." *Id.* at § 40-71-400(D)(2). And finally, extensive logs must be kept on each patient's use and disuse of all medications. *Id.* at § 40-71-400(F). All of these duties fall within the general obligation of "general supervision and oversight," which simply means "[a]ssuming responsibility for the well-being" of all residents in the facility. *Id.* at § 40-71-10.

The Commissioner interprets the regulations to require the facility to coordinate, with a certain level of proactivity, the handling of each resident's use of prescription medications. In the directive that all medications shall be "administered in accordance with the physician's instructions" and shall not be "changed" or "discontinued" by the facility, the Commissioner finds a regulatory duty for the facility to take measures *to ensure* that the resident actually takes his medications as the doctor ordered. The Commissioner's training curriculum embraces this view. *See* Commissioner's Brief at 4 (Aug. 15, 2000) (training modules developed under 22 VAC § 40-71-400(D)(2)).

---

[1] The Virginia General Assembly recently amended several sections of the statute, effective July 1, 2000, *see* 2000 Va. Acts, ch. 845, but these amendments do not affect SRC's duties in this case.

Under the Commissioner's interpretation, if the resident does not receive his medications (either by outright refusing to do so or by being absent when the drug cart makes its rounds), the facility must take appropriate measures to make sure the medication regimen is not "changed" or "discontinued" by default. *Id.* When a patient refuses to take his medicine, the most obvious response would be to advise the resident's physician of the situation and await instructions. If the problem involves the patient not being present when the drug cart arrives at his door, the required response would be to coordinate the dispensing schedule to avoid missed doses.

Under SRC's interpretation of the regulations, the facility has a purely reactive duty to manage the administration of medications. If the resident is absent when the drug cart makes its rounds, the facility need only record that fact. If the resident refuses to take his medicine — whether once, twice, or repeatedly — the facility has no obligation to bring this fact to his physician's attention (or, for that matter, to anyone's attention). After all, SRC argues, in neither scenario is the medication being "changed" or "discontinued" *by the facility* within the meaning of § 40-71-400(A).

Though SRC's position has semantic appeal (albeit an oversimplistic one), it falls far short of demonstrating that the Commissioner's interpretation should be rejected as arbitrary and capricious. The Commissioner applies a contextual meaning to the phrase "changed" or "discontinued" by the facility. It begins with the premise that residents are "aged, infirm, or disabled," and the facility has a statutory duty to provide "protection, general supervision and oversight" to residents. *See* Va. Code Ann. § 63.1-172. In short, the statutory scheme rests on the *a priori* proposition that the facility will be "[a]ssuming responsibility for the well-being" of its residents. 22 VAC § 40-71-10.

This overarching duty cannot be reconciled with the facility's failure to take appropriate measures to ensure that the resident actually receives his prescription medications when the facility knows that, for whatever reason, that is not happening. It takes little interpretative latitude to understand how this situation fits within a prohibition against medications being "changed" or "discontinued" by the facility. In the context of the statutory scheme, the Commissioner's proactive interpretation of SRC's regulatory duties cannot be dismissed as unreasonable.

True enough, as SRC insists, it operates neither a "hospital nor a nursing home" and does not directly provide medical services for residents. *Commercial Distributors v. Blankenship*, 240 Va. 382, 386, 397 S.E.2d 840, 842 (1990). The facility's "only health care responsibility" involves the administration of medications. *Id.* This limited scope, however, only underscores the importance of discharging at a high degree of competence the

"only" health care duty the facility has. To be sure, the duty to administer medications to "aged, infirm or disabled" residents has a public policy value that can hardly be exaggerated. As the Commissioner argues, "there can be no more critical need of residents requiring strict compliance than those related to their medical needs." Commissioner's Brief at 5 (Aug. 15, 2000).

The Commissioner's interpretation also takes into account basic interpretative canons governing the construction of statutes and regulations. Provisions in the written codes should not be treated "as isolated fragments of law," *Commonwealth v. Chamberlain*, 31 Va. App. 533, 539-40, 525 S.E.2d 19 (2000) (citation omitted), but rather as interconnected pieces of a "symmetrical and coherent regulatory scheme," *Food & Drug Admin. v. Brown*, 529 U.S. ___, 120 S. Ct. 1291, 1301 (2000) (citation omitted).

From this perspective, "a word takes color and expression from the purport of the entire phrase of which it is a part, and . . . must be read in harmony with its context." *Commonwealth v. Wallace*, 29 Va. App. 228, 233, 511 S.E.2d 423, 425 (1999) (quoting *Turner v. Commonwealth*, 226 Va. 456, 460, 309 S.E.2d 337, 339 (1983)). Courts consider more than the "bare meaning of the word," *Bailey v. United States*, 516 U.S. 137, 141 (1995) (citation omitted), but also the interpretation that best "achieves the beneficial purpose" of the law. *Chamberlain*, 31 Va. App. at 539-40, 525 S.E.2d at 539. Applied to this case, each of these canons supports the Commissioner's construction of the regulations.

Given the validity of the Commissioner's legal interpretation, his administrative factual findings also cannot be disturbed unless they can be characterized as arbitrary and capricious. As SRC appears to acknowledge,[2] no such showing can be made in this case. On both counts, SRC failed to take appropriate measures to ensure that the residents actually received their medications. The Commissioner's factual findings justify his conclusion that SRC violated its duty to ensure that medications not be changed or discontinued either deliberately or by default.

The Commissioner's random audit found that two patients had not been receiving medications pursuant to their doctor's standing orders. At the time of the audit, SRC had done nothing about either situation. With one of the patients, SRC eventually contacted the local VA hospital (after the audit revealed the error) to coordinate an appointment with a local physician. The physician for the other patient (again, after the audit) terminated the previously prescribed medication. SRC sees these facts as vindicating its position. They show just the opposite. Both results should have been obtained before the

---

[2] *See* Appellant's Brief at 2-3 (July 28, 2000).

audit, when SRC first realized that neither resident had been taking his medications.

The Commissioner also cannot be faulted for penalizing SRC for the resident who had not been receiving his Dilantin medication. It matters not that the resident had a medical emergency because of his unexplained absences from the home or because of his alleged refusal to take the medicine when SRC conducted its daily rounds. SRC dutifully recorded each time the patient was not getting his medicine. SRC performed its log-keeping task well but failed in its more important oversight duty inherent in both the statute and regulations. To be sure, the very reason the regulations placed this duty on SRC was to guard against the possibility that one of its residents would be found collapsed in the middle of a dangerous public highway having a medical emergency.

The Court declines SRC's invitation to vacate the Commissioner's administrative findings in this case. It is just this kind of case in which the judiciary should take "due account" of the "experience and specialized competence of the agency" charged by the General Assembly with enforcing its statutory policies. *Virginia Real Estate Bd.*, 9 Va. App. at 160-61, 384 S.E.2d at 627 (quoting Virginia Code Ann. § 9-6.14:17). This unique competence, when exercised in pursuit of the "purposes of the basic law under which the agency acted," *Holtzman Oil Corp.*, 32 Va. App. at 539, 529 S.E.2d at 337 (citation omitted), renders all but the truly arbitrary and capricious agency decisions invulnerable to judicial interference.

In sum, SRC cannot overcome the presumption of validity that protects the Commissioner's interpretation of the regulations governing the administration of medications at regulated facilities. Nor can SRC demonstrate any palpable error in the Commissioner's application of the legal principles to the facts of this case. As a result, the Court affirms the Commissioner's Special Order and dismisses this appeal with prejudice.

It is so adjudged, ordered, and decreed.