COURT OF APPEALS OF VIRGINIA


Present:   Judges Frank, Petty and Senior Judge Willis
Argued at Chesapeake, Virginia


ELBOW FARM, INC. AND
  ELBOW ENTERPRISES, INC.
  T/A ELBOW ROAD FARM CDD LANDFILL
  SOLID WASTE PERMIT NO. 305
                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 1611-06-1                      JUDGE JERE M. H. WILLIS, JR.
                                                          FEBRUARY 13, 2007
DAVID K. PAYLOR,
  DIRECTOR OF VIRGINIA
  DEPARTMENT OF ENVIRONMENTAL QUALITY AND
  VIRGINIA DEPARTMENT OF ENVIRONMENTAL QUALITY


              FROM THE CIRCUIT COURT OF THE CITY OF CHESAPEAKE
                            Randall D. Smith, Judge

              Brian L. Buniva (Corey B. Simpson; LeClair Ryan, A Professional
              Corporation, on briefs), for appellants.

              Catherina F. Hutchins, Assistant Attorney General (Robert F.
              McDonnell, Attorney General; Roger L. Chaffe, Senior Assistant
              Attorney General, on brief), for appellees.


        Elbow Farm, Inc. and Elbow Enterprises, Inc. t/a Elbow Road Farm CDD Landfill Solid

Waste Permit No. 305 (collectively "Elbow Farm") appeal the judgment of the trial court affirming

a decision by the Director of the Department of Environmental Quality (the Director) denying their

requests for variances from ground water monitoring requirements at their landfill in Chesapeake

and requiring ground water monitoring at the closed portion of the landfill.  Elbow Farm argues that

the trial court erred:  (1) in affirming the Director's decision defining the terms "aquifer" and

"uppermost aquifer" underlying the landfill and requiring ground water monitoring of the

_____
[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"uppermost aquifer"; (2) in upholding the admission of certain evidence at the informal fact finding conference; (3) in holding that substantial evidence in the agency record supports the Director's finding that the area to be monitored is the "uppermost aquifer"; (4) in upholding the Director's decision to include ground water monitoring requirements for the closed portion of the landfill in the amended permit; and (5) in denying Elbow Road attorneys' fees and costs. We affirm the judgment of the trial court.

## Background

In accordance with familiar principles, "we review the facts in the light most favorable to sustaining the [agency]'s action," Atkinson v. Virginia Alcoholic Beverage Control Comm'n, 1 Va. App. 172, 176, 336 S.E.2d 527, 530 (1985), and "take due account of the presumption of official regularity, the experience and specialized competence of the agency, and the purposes of the basic law under which the agency has acted," Code § 2.2-4027.

In 1962, Elbow Farm began mining sand and gravel on the land underlying the site of the subject landfill. In August 1980, the State Health Commissioner, a predecessor to the Department of Environmental Quality (DEQ), issued a permit authorizing operation of a borrow pit sanitary landfill at the site. In 1989, the permit was modified to permit the facility to receive only construction wastes, demolition wastes, inert wastes, and brush and tree trimmings, also known as "CDD" wastes. The CDD disposal area is about 8.3 acres. The modified permit required quarterly ground water monitoring for four "indicator parameters." Elbow Farm began ground water monitoring in 1991.

The landfill area is underlain by two aquifers relevant to this case. The upper aquifer, known as the Columbia aquifer, is separated from the deeper aquifer, the Yorktown aquifer, by a layer of low-permeability clay. A portion of the Columbia aquifer was removed from the landfill site by the gravel and sand mining. DEQ found that the ground water monitoring network at the

landfill is installed "both in undisturbed aquifer sediments and inert waste." Based on information provided by Elbow Farm, DEQ concluded that four of the six monitoring wells are screened in materials that are a mixture of undisturbed aquifer sediment and inert waste, with the percentage of undisturbed aquifer materials ranging up to forty-five percent. One monitoring well is screened entirely in undisturbed aquifer sediments, and the sixth well is screened completely in inert waste. The well bores generally ended at or near the upper limit of the low-permeability clay layer lying above the Yorktown aquifer.

In 1993, DEQ requested that Elbow Farm begin more extensive ground water monitoring based on a statistically significant increase of specific conductance in ground water, which could indicate an increased amount of inorganic contaminants at the site. Elbow Farm began the monitoring for the additional constituents in 1997. Ground water monitoring data from 1999 indicated the presence of numerous "pollutants of concern."

In June 2000, Elbow Farm submitted to DEQ a request for a variance to suspend ground water monitoring pursuant to 9 VAC 20-80-750(A)(1)(a). The request included an alternate sampling and analysis plan. In October 2000, Elbow Farm submitted to DEQ an application for a major permit amendment and a petition for a variance from ground water protection standards pursuant to 9 VAC 20-80-760. On July 13, 2001, DEQ issued a notice of tentative denial concerning the request to suspend ground water monitoring. Elbow Farm requested an informal fact finding conference pursuant to Code § 2.2-4019.

On December 27, 2002, DEQ sent Elbow Farm a "Notice of Informal Fact Finding Conference" with attachments. On February 5, 2003, the informal fact finding conference (IFFC) was held before a presiding officer. At the IFFC, Elbow Farm objected to the admission of excerpts from geological texts and articles introduced by DEQ. On March 31, 2003, the IFFC presiding officer reported to the Director, recommending that the requests for variances be denied. On May

29, 2003, the Director issued his final case decision, denying the petition for a variance to suspend ground water monitoring and institute an alternative plan and denying the petition seeking a variance from ground water protection standards and establishment of non-residential alternate concentration limits. Elbow Farm appealed these decisions to the trial court. Code § 2.2-4026.

On August 19, 2004, while the appeal was pending in the trial court, DEQ amended Elbow Farm's landfill permit, requiring Elbow Farm to maintain the ground water monitoring requirements from the previous permit for the closed portion of the landfill. Elbow Farm appealed the amended permit, and the trial court consolidated the two appeals.

The trial court affirmed the decisions of the Director.

### Analysis

### I. Evidence Admitted at the IFFC

Elbow Farm contends the trial court erred: (1) in upholding the admission of evidence at the IFFC in violation of Code § 2.2-4019(A)(iii); (2) in finding that the evidence was not relied upon by the IFFC presiding officer or the Director; and (3) in finding that if the admission of the evidence was improper, the error was harmless. Elbow Farm argues that no other evidence in the record supports the Director's findings.

Code § 2.2-4019(A)(iii), addressing the procedures to be used at an IFFC, provides that a party shall have notice of "any contrary fact basis or information in the possession of the agency that can be relied upon in making an adverse decision." At the IFFC, Elbow Farm challenged the admission of excerpts from geological texts and articles introduced by DEQ concerning the geology of the area. It argued that it had not been given proper notice that these items would be employed.

> In an appellate review of a hearing officer's decision, the burden is on the "party complaining of agency action to designate and demonstrate an error of law subject to review by the court. Such issues of law include: . . . observance of required procedure

- 4 -

> where any failure therein is not mere harmless error." Code
> § 2.2-4027. Accordingly, a party seeking relief from a founded
> disposition of abuse on grounds that the local department failed to
> comply with required procedure "must demonstrate such failure
> was not mere harmless error." J.B. v. Brunty, 21 Va. App. 300,
> 305, 464 S.E.2d 166, 169 (1995).

Jones v. West, 46 Va. App. 309, 326-27, 616 S.E.2d 790, 799 (2005).

The presiding officer did not refer to the challenged evidence in his findings and conclusions. Rather, he referenced Elbow Farm's own evidence showing that four of the six monitoring wells were installed in sites containing undisturbed aquifer material and that one monitoring well was screened completely in undisturbed aquifer material.

Contrary to Elbow Farm's assertion, the Director did not base his decision on DEQ's argument that inert fill constituted part of the Columbia aquifer. Rather, paragraph two of the Director's conclusions states: "Groundwater is retained, in some part, by the remnants of the undisturbed sediments of the Columbia aquifer."

A Geotechnical and Hydrogeological Report prepared by Elbow Farm's consultant discusses the regional geology of the area and describes the presence of the "Columbia Group of sediments [as] the uppermost geologic sequence in the vicinity of the landfill" and states:

> The surficial formation present in the vicinity of the landfill
> has been identified as the Norfolk Formation [one of the six
> formations that form the Columbia Group of sediments].
> However, borrow pit operations at the facility have removed nearly
> all soils above the [low-permeability clay unit] at the facility, with
> the exception of the basal portion (generally five feet or less) of the
> Columbia Group.

Malcolm-Pirnie, Inc., Elbow Road Farm, Inc, Geotechnical and Hydrogeological Report, 3-8 (April 2000).

Thus, Elbow Farm's own evidence established that part of the Columbia aquifer remained at the site. Even had the Director considered the challenged materials, his conclusions were based on all the information in the agency record, some of which was provided by Elbow

Farm, establishing that some of the natural sediments of the Columbia aquifer remain under the landfill. Accordingly, the admission of the challenged evidence, if error, was harmless error and could not have "had a significant impact on the ultimate decision so as to undermine the 'substantiality of the evidential support' for the factual findings." See Virginia Bd. of Med. v. Fetta, 244 Va. 276, 283, 421 S.E.2d 410, 414 (1992).

## II. Aquifer and Uppermost Aquifer

The central issue in this case was whether the ground water the Director required Elbow Farm to monitor was located in the "uppermost aquifer" underlying the landfill.

Judicial review of an agency's factual findings "is limited to determining whether substantial evidence in the agency record supports its decision." Avante at Lynchburg, Inc. v. Teefey, 28 Va. App. 156, 160, 502 S.E.2d 708, 710 (1998). Under the substantial evidence standard, the reviewing "court may reject the agency's findings of fact 'only if, considering the record as a whole, a reasonable mind would *necessarily* come to a different conclusion.'" Virginia Real Estate Comm'n v. Bias, 226 Va. 264, 269, 308 S.E.2d 123, 125 (1983) (quoting B. Mezines, Administrative Law § 51.01 (1981)). "The phrase 'substantial evidence' refers to 'such relevant evidence as a reasonable mind *might* accept as adequate to support a conclusion.'" Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

> "*Where . . . the issue concerns an agency decision based on the proper application of its expert discretion, the reviewing court will not substitute its own independent judgment for that of the agency but rather will reverse the agency decision only if that decision was arbitrary and capricious.* [I]n reviewing an agency decision, the courts are required to consider the experience and specialized competence of the agency and the purposes of the basic law under which the agency acted."

Holtzman Oil Corp. v. Commonwealth, 32 Va. App. 532, 539, 529 S.E.2d 333, 337 (2000) (quoting Johnston-Willis, Ltd. v. Kenley, 6 Va. App. 231, 246, 369 S.E.2d 1, 9 (1988)).

- 6 -

DEQ, in conjunction with the Virginia Waste Management Board, is the Virginia agency charged with administering the Solid Waste Management Regulations. Code § 10.1-1400 *et seq*. DEQ possesses the requisite experience and competence necessary to determine what constitutes an "aquifer" and an "uppermost aquifer" as defined in the regulations. As such, its interpretations of the regulations governing ground water monitoring programs "are entitled to deference by a reviewing court and should only be overturned when found to be arbitrary and capricious." Id. (citing Fralin v. Kozlowski, 18 Va. App. 697, 701, 447 S.E.2d 238, 241 (1994)).

"Aquifer" is defined in the Solid Waste Management Regulations as "a geologic formation, group of formations, or a portion of a formation capable of yielding significant quantities of ground water to wells or springs." 9 VAC 20-80-10. "Uppermost aquifer" is defined in the regulations as "the geologic formation nearest the natural ground surface that is an aquifer, as well as, lower aquifers that are hydraulically interconnected with this aquifer within the facility boundary." Id.

Substantial evidence in the agency record supported the Director's factual finding that remnants of the Columbia aquifer existed at the landfill. Elbow Farm's monitoring well and boring log information demonstrated the existence of native soils beneath the landfill waste and above the low-permeability clay layer. Elbow Farm's geological report acknowledges that a "basal portion" of the Columbia aquifer remains in areas of the borrow pit. In its opening brief, Elbow Farm concedes that "minor remnants of the Columbia sediments are interspersed underneath the surface." Evidence also showed that the Columbia Group is "the uppermost geologic sequence in the vicinity of the landfill." Therefore, substantial evidence supported the Director's finding that "a portion of a geologic formation," which is the uppermost aquifer, remains under the landfill.

Elbow Farm argues that the portion of the Columbia aquifer underlying the landfill is not "capable of yielding significant quantities of ground water to wells or springs" and thus does not meet the definition of an aquifer. It notes that "significant" is defined as "having meaning; full of import." Webster's Third New Int'l Dictionary 2116 (1981). The Director argues that the fact that the water samples drawn can be tested renders the water supply significant.

"[D]efinitions must necessarily be construed and applied to support 'the purposes of the basic law,' and the interpretation made by the [agency] vested with the authority to administer the law is entitled to special weight in the courts." Virginia Alcoholic Beverage Control Comm'n v. York St. Inn, Inc., 220 Va. 310, 315, 257 S.E.2d 851, 855 (1979). In construing statutory language that "'is plain and unambiguous, we are bound by the plain meaning of that statutory language.'" Beck v. Shelton, 267 Va. 482, 488, 593 S.E.2d 195, 198 (2004) (quoting Lee County v. Town of St. Charles, 264 Va. 344, 348, 568 S.E.2d 680, 682 (2002)).

The purpose of the Solid Waste Management Regulations is "to protect the public health, public safety, the environment and natural resources." 9 VAC 20-80-40(A). The ground water monitoring program implemented pursuant to the Solid Waste Management Act was established to determine a landfill's "impact on the quality of the ground water in the uppermost aquifer underlying the facility." 9 VAC 20-80-300(A)(2)(a). The Columbia aquifer underlies not only Elbow Farm's landfill, but also a large portion of the Hampton Roads area and is an important source of water to that area. Protection of that water source is a proper matter of public concern and regulation.

The agency record shows that the geologic formation in which the monitoring wells were located at Elbow Farm's landfill was capable of producing sufficient ground water to permit testing for constituents of concern, such as inorganic chemicals. Given the purpose of the regulatory scheme, prevention of contamination of the aquifer at large, a reasonable mind could

conclude that a significant or meaningful quantity of ground water at the landfill site would be a quantity that permits monitoring for contamination. Thus, substantial evidence supports the trial court's upholding the Director's interpretation that the definition of an aquifer includes a geologic formation or part of a formation capable of yielding sufficient ground water quantities to allow for ground water monitoring.

### III. Amended Permit Requirements

Elbow Farm argues the trial court erred by upholding the ground water monitoring requirements contained in the amended permit concerning Module X of the landfill because the area required to be monitored is not the "uppermost aquifer." However, for the reasons stated above, we affirm the trial court's decision.

### IV. Attorneys' Fees

Code § 2.2-4030(A) provides in relevant part:

> In any civil case brought under Article 5 ([Code] § 2.2-4025 *et seq.*) of this chapter or [Code] §§ 2.2-4002, 2.2-4006, 2.2-4011, or § 2.2-4018, in which any person contests any agency action, such person shall be entitled to recover from that agency, . . . reasonable costs and attorneys' fees if such person substantially prevails on the merits of the case and the agency's position is not substantially justified, unless special circumstances would make an award unjust.

Elbow Farm did not substantially prevail on the merits of this case, and the Director's decisions were substantially justified. Therefore, the trial court did not err by refusing to award Elbow Farm attorneys' fees and costs.

We affirm the judgment of the trial court.

Affirmed.